**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**

RANDALL JORDAN, derivatively on behalf of PAPA JOHN'S INTERNATIONAL, INC.

Plaintiff,

vs.

TODD A. PENEGOR, RAVI THANAWALA, CHRISTOPHER L. COLEMAN, JOHN W. GARRATT, STEPHEN L. GIBBS, LAURETTE T. KOELLNER, JOCELYN C. MANGAN, SONYA E. MEDINA, and JOHN C. MILLER

Defendants,

and

PAPA JOHN'S INTERNATIONAL, INC.,

Nominal Defendant.

Case No. 3:26-ccv-887-CHB

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Randall Jordan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Papa John's International, Inc. ("Papa John's" or the "Company"), files this Verified Shareholder Derivative Complaint against Todd A. Penegor ("Penegor"), Ravi Thanawala ("Thanawala"), Christopher L. Coleman ("Coleman"), John W. Garratt ("Garratt"), Stephen L. Gibbs ("Gibbs"), Laurette T. Koellner ("Koellner"), Jocelyn C. Mangan ("Mangan"), Sonya E. Medina ("Medina"), and John C. Miller ("Miller") (collectively, the "Individual Defendants," and together with Papa John's, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Papa John's, unjust enrichment, abuse of

control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Penegor and Thanawala for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Papa John's, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 7, 2025, through August 5, 2026, both dates inclusive (the "Relevant Period").

2. Papa John's operates and franchises pizza delivery and takeout restaurants within the highly competitive quick service restaurant ("QSR") industry. As of December 28, 2025, there were over 6,000 Papa John's restaurants in operation and over 5,000 franchised restaurants operating throughout North America and various international markets.

3. Throughout the Relevant Period the Individual Defendants highlighted the purported benefits of the Company's strategic initiatives and its ability to support the Company's overall growth and market positioning against increasing competition, shifting consumer sentiments, and the highly promotional nature of the QSR industry.

4. For example, on February 26, 2026, the Company held an earnings call for the fourth quarter and full Fiscal Year 2025[1] ("FY 2025 Earnings Call"). During the FY 2025 Earnings Call, Defendant Penegor touted the success of the Company's strategic transformation and highlighted purported business prospects, stating in relevant part:

> 2025 was a year of transformation for Papa John's as we made improvements across the company to our brand health, technology platform, innovation pipeline, customer experience, restaurant fleet and cost structure. These actions, together with key leadership appointments and organizational changes, ***represent meaningful progress against our transformational objectives***. We have ***substantially improved our brand health as well as our value and quality perception with our customers, which will translate into market share gains***.[2]

5. Even as the Company's financial performance began to decline, the Individual Defendants assured investors of the effectiveness and potential of the implemented strategic changes and the Company's ability to respond to shifts in consumer values and the high promotional nature of the market. For example, on May 7, 2026, the Company held an earnings call for the first quarter of Fiscal Year 2026 ("Q1 2026 Earnings Call"), during which Defendant Penegor stated the following in relevant part:

> As anticipated, North America comparable sales ended the first quarter down mid-single digits, primarily driven by declining orders, which were pressured by lower new customer acquisition . . . ***We are working with urgency to address areas of opportunity and capitalize on areas of strength through our transformation work. Our two largest opportunities to gain share are building on our improved value perception and leveraging our rebuilt innovation pipeline to win new customers, elevate our pizza order mix to more premium pizzas, drive add-ons and expand our total addressable market.***

6. Notwithstanding the Individual Defendants' assurances throughout the Relevant Period, the truth emerged on August 6, 2026, when the Company published a press release ("Q2

---

[1] The Company's fiscal year ends on the last Sunday in December of each year.
For the fiscal period from December 30, 2024 to December 28, 2025 (the "Fiscal Year 2025").
For the fiscal period from December 29, 2025 to December 27, 2026 (the "Fiscal Year 2026").
[2] All emphasis herein is added unless otherwise stated.

2026 Press Release") and held an earnings call for the second quarter of Fiscal Year 2026 ("Q2 2026 Earnings Call") that revealed a continual decline in the Company's overall financial performance. Specifically, the Q2 2026 Press Release revealed that the Company's North America comparable sales had decreased by approximately 8.3% compared to the previous year and the Company experienced a decreased net income of "$9 million compared with $10 million in the prior year second quarter."

7. Moreover, during the Q2 2026 Earnings Call, Defendant Penegor disclosed that the Company had "felt the impacts of the softer consumer backdrop and highly promotional QSR environment, which have continued to challenge our financial performance." To this end, Defendant Penegor further acknowledged that "while our focus is unrelenting, it's clear that our ***transformation is taking longer than expected. We know that we must execute better and move faster***."

8. On this news, the price of the Company's common stock fell $5.11 or approximately 17.2% per share, from a closing price of $29.75 per share on August 5, 2026, to close at $24.64 per share on August 6, 2026.

9. Throughout the Relevant Period, the Individual Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and failed to disclose, *inter alia*, that: (1) the effectiveness of and material benefits resulting from the Company's strategic initiatives were overstated; (2) the Company was unable to efficiently respond to an the aggressive promotional nature of the QSR industry, growing market competition, and shifting values among consumers; and (3) as a result, the Individual Defendants' statements and projections about the

Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12. In light of the Individual Defendants' misconduct—which has subjected the Company and its current Chief Executive Officer ("CEO") and former Chief Financial Officer ("CFO") to a securities fraud class action lawsuit pending in the United States District Court for the Western District of Kentucky (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Penegor's and Defendant Thanawala's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

18. Plaintiff is a current shareholder of Papa John's. Plaintiff has continuously held shares of Papa John's common stock at all relevant times.

### Nominal Defendant Papa John's

19. Papa John's is a Delaware corporation with principal executive offices at 2002 Papa Johns Boulevard, Louisville, KY 40299. Papa John's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "PZZA."

**Defendant Penegor**

20. Defendant Penegor has served as the Company's President and CEO and as a Company director since 2024.

21. The Schedule 14A the Company filed with the SEC on March 26, 2026, (the "2026 Proxy Statement") stated the following about Defendant Penegor:

> **Reasons for Nomination**
>
> Todd Penegor is a seasoned restaurant and consumer brands executive with over two decades of experience leading iconic quick service restaurant (QSR) and consumer packaged goods (CPG) companies through growth, disruption and industry volatility. He has a hands on understanding of global franchise systems and a strong record of building trusted, performance driven franchisee partnerships. Throughout his career, he has consistently delivered same store sales growth, expanded unit counts and improved margins while elevating brand quality to sustain long term performance. With leadership grounded in rigorous financial discipline, he approaches capital allocation with a shareholder aligned mindset and maintains a clear focus on strategy and accountability as the foundation for durable value creation.
>
> **Key Skills and Qualifications**
>
> - Under Mr. Penegor's leadership, Papa Johns is strengthening its innovation and operational framework, invigorating the product pipeline with new platforms such as Papa Dippa, Grand Papa and a new Pan Pizza. He also launched the Perfect Bake initiative and is modernizing the digital ecosystem, which has driven stronger engagement across the nearly 41 million member Papa Rewards Program since its enhancement in late 2024.
>
> - Mr. Penegor led Wendy's through a period of sustained transformation, achieving 12 consecutive years of same-restaurant sales growth. He strengthened franchisee economics through improved franchise relations and real estate optimization. To enhance both customer experience and restaurant efficiency, he drove growth by launching new loyalty programs and data-driven marketing. Under his leadership, digital sales grew 30% and reached 13% of total sales at the time of his retirement from the Company.

- Mr. Penegor brings extensive experience modernizing QSR brands through menu innovation to generate significant new revenue streams (e.g., the $5 Biggie Bag and Wendy's national breakfast platform). At Wendy's, he also expanded operations across Europe, Asia, the Middle East and Latin America and revitalized franchise relations, achieving satisfaction scores more than 10 points above industry averages in both the U.S. and international markets.

- Mr. Penegor's background includes serving in senior and executive financial leadership roles at Kellogg Company and Ford Motor Company, contributing to his deep expertise in finance, strategy, disciplined capital allocation, global operations, and mergers and acquisitions.

**Career Highlights**

*The Wendy's Company (Nasdaq: WEN)*

- President and CEO (2016-2024)
- CFO (2013-2015)

*Kellogg Company (former NYSE: K)*

- President, Kellogg's Snacks (2008-2013)
- VP and CFO, Kellogg Europe (2007-2008)
- VP and CFO, Kellogg's Snacks (2002-2007)
- CFO, Kellog US Sales Organization (2002)
- Various leadership positions (2000-2002)

*Ford Motor Company (NYSE: F)*

- Various roles within finance organization, supporting M&A, global joint ventures and treasury

(Emphasis in original).

**<u>Defendant Thanawala</u>**

22. Defendant Thanawala served as the Company's CFO from July 2023 until June 30, 2026, and President, North America, from November 17, 2025, to June 30, 2026. He also served in an advisory role until July 31, 2026, to assist with the transition of the CFO role. Previously,

Defendant Thanawala served as the Company's CFO and Executive Vice President, International, from September 2024 until November 17, 2025, and as the Company's interim CEO from March 2024 until August 2024.

23. The Company's press release published on November 18, 2025, titled "Papa Johns Promotes Ravi Thanawala to Chief Financial Officer and President, North America," stated the following about Defendant Thanawala:

> **About Ravi Thanawala**
>
> Thanawala was appointed Chief Financial Officer and EVP, International in September 2024 after serving as the Company's Chief Financial Officer since July 2023. He served as the Company's Interim Chief Executive Officer from March 2024 to August 2024.
>
> Thanawala joined Papa Johns from Nike, Inc., where he most recently served as Chief Financial Officer of Nike North America, Nike Inc.'s largest division, generating approximately $20 billion in revenue on an annual basis.
>
> During his seven years at Nike, Inc., Thanawala also served as the Global VP and CFO of the Converse brand, which included working within a franchise model that comprised most of the brand's international business. In this role, he guided Nike's global omnichannel direct-to-consumer strategy, successfully turning around the $3.5 billion dollar Converse brand. In addition, he was the Global VP of Retail Excellence, overseeing the brand's performance across its business channels of franchises, licenses, direct to consumer and wholesale.
>
> Prior to Nike, Inc., Thanawala spent eight years at ANN INC. with progressively increasing responsibilities in finance and operations. He served in the finance leadership role for LOFT; led ANN INC's Asia operations, global logistics and international trade based in Hong Kong; and eventually became CFO of the ANN INC. business, a subsidiary of Ascena Retail Group, Inc.

(Emphasis in original).

**Defendant Coleman**

24. Defendant Coleman has served as a Company director since 2012. He also serves as the Chair of the Corporate Governance and Nominating Committee.

25. The 2026 Proxy Statement stated the following about Defendant Coleman:

**Reasons for Nomination**

Christopher Coleman brings over three decades of global banking and finance experience. In his executive and board roles, he has overseen mergers and acquisitions, capital deployment decisions and enterprise-level risk management, enabling him to evaluate and provide oversight of Papa Johns capital allocation priorities and long-term value creation opportunities. This experience, combined with his service on the Papa John's Board and longstanding engagement with the Company's shareholders and franchisees, affords him a detailed understanding of the strategic evolution, business model and international operations across consumer economic cycles.

**Key Skills and Qualifications**

- Mr. Coleman's executive role at Rothschild & Co provides a background in capital stewardship, risk management and corporate transactions, from initial evaluation and due diligence through execution. He applies this experience to support Papa Johns balance sheet discipline, unit-level franchise economics and long-term strategic planning.

- Mr. Coleman's career spans extensive global finance and cross border transaction experience, providing valuable insight into international markets dynamics that are critical to Papa Johns global growth and competitive positioning.

- Through ongoing, first hand dialogue with Papa Johns franchisees, Mr. Coleman serves as a trusted link between the Board and the franchise network. His active engagement helps facilitate constructive alignment, strengthen franchise relationships and inform decisions that impact systemwide performance.

- In his position as Independent Chairman of Randgold Resources, he played a key role in overseeing the successful $18.3 billion merger with Barrick Gold Corporation in 2018, a complex, cross-border combination that created an industry-leading global gold company.

**Career Highlights**

*Rothschild & Co.*

- Global Partner and Group Head of Banking (since 2015)

- Chairman of Rothschild & Co Bank International (since 2006)

- Chairman of Five Arrows Leasing Group (2008-2015)

- Director of Rothschild & Co Pension Fund (since 2009)

- Member of Assets and Liabilities Committee
- Member of Wealth and Asset Management Executive Committee

(Emphasis in original).

**Defendant Garratt**

26. Defendant Garratt has served as a Company director since September 2023. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee.

27. The 2026 Proxy Statement stated the following about Defendant Garratt:

> **Reasons for Nomination**
>
> John Garratt brings more than two decades of disciplined financial leadership and strategic transformation experience across major multi unit retail and restaurant brands. He offers deep insight into consumer behavior and proven expertise in developing new customer offerings, building loyalty, improving unit level economics and scaling businesses — consistently leveraging technology to enhance brand differentiation and drive top and bottom line performance. At Papa Johns, he applies this experience to advance brand innovation, menu strategy and global customer engagement in support of sustained long term growth.
>
> **Key Skills and Qualifications**
>
> - At Dollar General Mr. Garratt developed and implemented a long-term strategic planning process and team which drove efforts to identify and execute key transformative strategic initiatives involving new sales layers, concepts, digital tools, delivery service, expanded supply chain capabilities and international expansion.
> - Mr. Garratt led efforts to develop the company's strategic roadmap, reshape capital allocation and accelerate organic unit expansion while restructuring and implementing zero based budgeting to fuel high return growth.
> - He developed and led Dollar General's commercial analytics team which significantly enhanced decision support and results from merchandising analytics, pricing, market planning and consumer insights.
> - Mr. Garratt led efforts on the acquisition of over 300 stores at Dollar General and helped lead the divestiture of two brands at Yum, demonstrating disciplined M&A judgment.

- He brings board governance expertise through leadership of audit and investment committees at other brands, contributing governance insights and best practices to oversee Papa Johns value creation initiatives.

- In addition to overseeing Dollar General's entry into Mexico, in his previous roles at Yum! Brands, Mr. Garratt served as Vice President of Finance and Division Controller for KFC, Pizza Hut, and Yum Restaurants International, partnering with global teams to strengthen international operations and controls while delivering rapid growth.

**Career Highlights**

*Dollar General (NYSE: DG)*

- President and CFO (2022-2023)

- EVP and CFO (2015-2023)

- SVP, Finance & Strategy (2014-2015)

*Yum! Brands (NYSE: YUM)*

- VP, Finance, (2013-2014)

- Various senior director and director roles in corporate strategy and financial planning (2004-2013)

(Emphasis in original).

**Defendant Gibbs**

28. Defendant Gibbs has served as a Company director since September 2023. He also serves as a member of the Audit Committee.

29. The 2026 Proxy Statement stated the following about Gibbs:

**Reasons for Nomination**

Steve Gibbs is a seasoned financial executive with a proven ability to strengthen global organizations through disciplined financial leadership, operational rigor and data-driven decision making. As a former Chief Accounting Officer across multiple consumer facing companies, he has overseen complex technical accounting, financial reporting and enterprise wide control environments while helping management teams translate market trends and analytics into effective business strategy. His deep expertise in establishing rigorous financial discipline, implementing scalable systems and enhancing operational efficiency enables him

to contribute meaningfully to Papa Johns growth, margin expansion and governance oversight.

**Key Skills and Qualifications**

- Mr. Gibbs has implemented large scale, integrated financial and operational systems that drive measurable performance improvement. At Home Depot, he co-led the company wide SAP implementation, unifying reporting across business functions to enhance customer experience, increase operational efficiency and deliver enterprise level results.

- He played a central role in evaluating strategic investments and optimizing portfolio value at Home Depot, including the financial due diligence of major transactions such as the $8 billion acquisition of HD Supply Holdings, which strengthened the company's visibility in a strategic market segment. His ability to rigorously assess acquisition opportunities and value creation pathways aligns with shareholder expectations for disciplined growth.

- At Keurig Green Mountain, Mr. Gibbs spearheaded the company's financial reset, redirecting investments, implementing zero based budgeting to reinforce capital discipline, and installing data driven cost management systems that positioned the company for sustained expansion. His experience deploying performance enhancing financial systems across global operations at Keurig and Tyson Foods supports his record of improving margins and operational discipline.

- Having started his career at a Big Four accounting firm and subsequent leadership roles at Scientific Games, where he led international market budgeting and resource analyses to optimize product and sales performance, Mr. Gibbs brings deep expertise in regulatory compliance, internal controls, financial reporting and enterprise risk management.

**Career Highlights**

*Home Depot (NYSE: HD)*

- VP, Chief Accounting Officer and Corporate Controller (2020-2023)

*Tyson Foods (NYSE: TSN)*

- SVP, Chief Accounting Officer and Controller (2018-2020)

*Keurig Green Mountain (Nasdaq: KDP)*

- VP, Chief Accounting Officer (2011-2017)

*Scientific Games (OTCMKTS: LNWO)*

- VP, Chief Accounting Officer and Corporate Controller (2005-2011) planning (2004-2013)

(Emphasis in original).

**Defendant Koellner**

30. Defendant Koellner has served as a Company director since 2014. She also serves as the Chair of the Audit Committee.

31. The 2026 Proxy Statement stated the following about Defendant Koellner:

**Reasons for Nomination**

Laurette Koellner brings exceptional executive and board leadership experience, having guided global companies through major restructurings, complex M&A transactions, international expansion and crisis recovery. Her background spans responsibility for P&L and oversight of business strategy, finance, accounting and human capital programs. As Chair of the Audit Committee, Ms. Koellner plays a critical role in overseeing Papa Johns financial reporting, enterprise risk management and internal controls, ensuring rigorous stress testing and strengthening long term governance resilience.

**Key Skills and Qualifications**

- Appointed by the U.S. Government to AIG's board of directors during the financial crisis recovery, Ms. Koellner helped lead the company through significant operational restructuring, ensuring AIG's ability to repay federal stabilization funds and restore financial health. Upon making taxpayers whole, Ms. Koellner was asked to serve as Executive Chairman of AIG's International Lease Finance Corporation and oversaw its $7.68B acquisition by AerCap.

- As a member of Boeing's Office of the Chairman, a four person leadership group including the CEO, CFO and CTO, Ms. Koellner held authority over enterprise wide decision making, including global strategy, operations and risk oversight across nearly 80 countries, navigating complex regulatory environments and volatile economic conditions, experience directly relevant to Papa Johns international growth strategy.

- As an independent director on the Sara Lee board, Ms. Koellner played a central role in a multi-year strategic restructuring, divesting non core businesses and separating the company into focused entities: Douwe Egberts and Hillshire Brands. These actions generated significant shareholder value and culminated in the IOP of Douwe Egberts and the $8.6B sale of Hillshire Brands to Tyson Foods at a substantial premium.

- Ms. Koellner has chaired audit committees at four public companies, bringing deep compliance and financial reporting expertise. At Papa Johns, she maintains close working relationships with senior finance leadership, providing rigorous financial oversight, challenge and strategic input on key accounting, reporting and risk matters and supporting the Company's long-term operational resilience.

**Career Highlights**

*International Lease Finance Corporation (subsidiary of AIG) (NYSE: AER)*

- Executive Chair (2012-2014)

*The Boeing Company (NYSE: BA)*

- President, Boeing International (2006-2008) and Connexion by Boeing (2004-2006)
- EVP, Chief Administration and Human Resources Officer (2002-2004)
- President, Shared Services (2001-2022)
- VP and Corporate Controller (1999-2001)
- VP and General Auditor (1996-1999)

(Emphasis in original).

**Defendant Mangan**

32. Defendant Mangan has served as a Company director since 2019. She also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

33. The 2026 Proxy Statement stated the following about Defendant Mangan:

**Reasons for Nomination**

Jocelyn Mangan brings two decades of top-tier technology leadership, having built and scaled globally influential platforms such as Citysearch, Ticketmaster, OpenTable and Snagajob. Her experience launching consumer and restaurant platforms across Asia, Europe and North America gives her a sophisticated understanding of digital disruption, platform innovation and evolving customer behavior across markets. Highly active across the technology and restaurant sectors, Ms. Mangan maintains direct visibility into emerging trends, disruptive

business models and next generation innovation, enabling her to contribute to Board oversight of Papa Johns digital investments, customer engagement advancements and international growth priorities.

**Key Skills and Qualifications**

- As CEO and founder of illumyn, Ms. Mangan advises investors, CEOs, boards and board-level talent on overall board strategy - from board composition to navigating growth and change, particularly as digital transformation and artificial intelligence reshape enterprise risk and competitive dynamics. She works closely with CEOs, directors, investors and an AI advisory council of senior technology leaders to advance board level AI governance capabilities, ensuring boards are equipped to oversee emerging risks and value creation opportunities.

- Ms. Mangan provides strategic guidance to restaurant leaders on next generation business models, consumer engagement strategies, aggregator economics and technology enabled growth. Her deep connections across Silicon Valley and the broader hospitality ecosystem position her to identify high value innovation pathways aligned with Papa Johns global expansion and digital transformation priorities.

- Having led product teams behind major consumer platforms across the markets, Ms. Mangan spearheaded development of the first OpenTable mobile app that revolutionized the restaurant reservation experience and elevated OpenTable's technology culture, accelerating its evolution into a mobile first global business. Her leadership played a foundational role in positioning OpenTable for its $2.6B acquisition by Booking Holdings.

- As COO and Chief Product & Marketing Officer at Snagajob, she oversaw full cycle product strategy and user experience transformation for millions of hourly worker interactions. At Ticketmaster, she led development of the first multilingual Olympic ticketing platform, strengthening international customer engagement and ensuring reliability during high demand digital events.

**Career Highlights**

*illumyn / illumyn impact*

- CEO, Founder (since 2018)

*Netflix (NASDAQ: NFLX)*

- Part-time moderator for Netflix Leadership Program (2019-2024)

*Snagajob*

- Chief Operating Officer (2017-2018)
- Chief Product and Marketing Officer (2016-2017)

*OpenTable (former Nasdaq: OPEN)*

- Held progressively senior product management roles (2005–2015), culminating in her position as SVP of Product Management and Design.

*Ticketmaster (NYSE: LYV)*

- Product, content and strategy leadership roles with increasing scope of responsibilities (1999-2005)

(Emphasis in original).

**Defendant Medina**

34. Defendant Medina has served as a Company director since 2015. She also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

35. The 2026 Proxy Statement stated the following about Defendant Medina:

**Reasons for Nomination**

Sonya Medina brings crisis tested governance leadership, cross sector strategic insight and global stakeholder engagement expertise to the Board. Her ability to navigate complex regulatory environments combined with her corporate reputation and brand building experience equips her to advise on global market positioning, community relevance and strategies to build consumer trust. During her Board service, she has guided Papa Johns strategy realignment and leadership transitions, demonstrating a strong focus on long-term value creation and providing strategic contributions to the oversight of Papa Johns global growth priorities, stakeholder engagement and enterprise-wide reputation management.

**Key Skills and Qualifications**

- Ms. Medina brings deep experience navigating complex and evolving regulatory environments, having overseen large scale U.S. and international public private initiatives, acquiring a nuanced understanding of how policy developments affect supply chains, labor markets, consumer behavior and brand trust. This perspective provides the Board with actionable insight into regulatory and stakeholder dynamics.

- As CEO of Reach Resilience, a ~$410 million foundation supporting communities in crisis, Ms. Medina has built high visibility partnerships across government, business and civic organizations. Her ability to expand reach and mobilize diverse communities provides practical insight into strengthening Papa Johns market presence, brand building and deepening stakeholder engagement.

- In her role as Vice President of Community & External Affairs at Silver Eagle Distributors, the largest Anheuser Busch provider, Ms. Medina expanded brand visibility across national retail locations and strengthened franchise partnerships through a rigorous, data driven approach that enhanced insights into customer segments, commercial activation and franchise system dynamics.

- As a board member at TKO Group Holdings, Ms. Medina oversaw the company's 2023 acquisition of Endeavor's sports assets (IMG and On Location) and the subsequent integration of multiple global businesses. Her experience evaluating transformative investments and navigating complex integrations strengthens the Board's oversight of long term strategy, capital allocation and enterprise value creation.

**Career Highlights**

*Reach Resilience*

- President and CEO (since 2022)

*Silver Eagle Distributors (an independent Anheuser-Busch wholesaler in the US)*

- VP, Community & External Affairs (2009-2013)

*The White House*

- Deputy Assistant to the President for Domestic Policy and Director of Projects for the First Lady (2001-2008)

*AT&T (NYSE:T)*

- Director, AT&T Global Foundation (2006-2008)

(Emphasis in original).

**Defendant Miller**

36. Defendant Miller has served as a Company director since 2023. He also serves as a member of the Compensation Committee.

37. The 2026 Proxy Statement stated the following about Defendant Miller:

**Reasons for Nomination**

John Miller is a two time restaurant brand CEO with a proven record of strengthening franchise systems and unifying operators around shared values, performance standards and brand expectations. He has built out restaurant networks, modernized guest experiences and driven consistent execution across U.S. and international franchise markets, enabling brands to grow through both industry disruption and market opportunities. His extensive operational and strategic leadership equips him to serve as a thoughtful, independent voice in the boardroom—one who can provide constructive challenge, support management effectively and help ensure strategy, capital allocation, and operating priorities remain aligned with sustainable, long term shareholder value.

**Key Skills and Qualifications**

- As CEO of Denny's, Mr. Miller delivered more than a decade of sustained performance, increasing the stock price by more than threefold during his tenure through disciplined capital allocation, modernization of the real estate portfolio and the opening of nearly 500 locations in strategically selected growth markets. These transformative actions expanded the brand's reach and enhanced individual restaurant profitability.

- Mr. Miller also accelerated Denny's international expansion, doubling the number of franchises in Puerto Rico and scaling the Canadian business to nearly 80 locations—more than any other U.S. competitor operating in the region. His proven ability to build strategic international partnerships offers actionable insight into global growth and market prioritization.

- He led Denny's digital transformation, securing an early national agreement with DoorDash, launching virtual brands such as The Meltdown and The Burger Den, and building customer facing technology and analytics teams. These initiatives modernized digital ordering and loyalty platforms, strengthened operational efficiency and created new, profitable revenue streams aligned with evolving consumer behavior.

- Mr. Miller spent 17 years with Brinker International, leading Global Franchise Development for Chili's before heading other brands at Brinker such as Romano's Macaroni Grill, On the Border, and Cozymel's. John then returned as CEO of Taco Bueno, his restaurant alma mater prior to joining Brinker, where he launched and scaled the franchise program and implemented a unified POS system to strengthen systemwide performance and deliver consistent, high quality customer experiences.

**Career Highlights**

*Delucca Gaucho Pizza & Wine*

- Managing Member (since 2022)

*Denny's (Nasdaq: DENN)*

- CEO (2011-2025)

*Taco Bueno Restaurant Chain*

- President & CEO (2005-2011)

*Brinker International (NYSE: EAT)*

- VP Romano's Macaroni Grill (1997 – 2004)
- VP Special Concepts, Cozymel's and On the Border (1993-1996)
- VP Global Franchising (1987 – 1992)

(Emphasis in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38. By reason of their positions as officers, directors, and/or fiduciaries of Papa John's and because of their ability to control the business and corporate affairs of Papa John's, the Individual Defendants owed Papa John's and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Papa John's in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Papa John's and its shareholders so as to benefit all shareholders equally.

39. Each director and officer of the Company owes to Papa John's and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

40. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Papa John's, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41. To discharge their duties, the officers and directors of Papa John's were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Papa John's, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

43. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

44. To discharge their duties, the officers and directors of Papa John's were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Papa John's were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kentucky, and the United States, and pursuant to the Company's own Code of Ethics and Business Conduct ("Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Papa John's conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Papa John's and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

45. Each of the Individual Defendants further owed to Papa John's and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

46. At all times relevant hereto, the Individual Defendants were the agents of each other and of Papa John's and were at all times acting within the course and scope of such agency.

47. Because of their advisory, executive, managerial, directorial, and controlling positions with Papa John's, each of the Individual Defendants had access to adverse, non-public information about the Company.

48. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Papa John's.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

51. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Papa John's was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

52. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

53. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Papa John's and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF ETHICS

54. The Company's Code of Ethics states it "applies to all team members of Papa John's International, Inc., and its affiliates and subsidiaries, wherever located[,]" and that "the term 'team member' refers to all officers, directors and employees of the Company, unless otherwise indicated."

55. Under the heading "Conflicts of Interest," the Code of Ethics provides the following, in relevant part:

> All team members are expected to avoid situations that create, could create, or give the appearance of creating, a conflict between team members' own interests and the interests of Papa John's. A conflict of interest occurs when a team member's own interest (including the interest of an immediate family member, or an organization with which a team member has a significant relationship) interferes or appears to interfere with the Company's interests. Although it is not possible to develop a comprehensive set of rules covering all circumstances or serving as a substitute for good judgment, the following are examples of types of activities that could potentially be considered a conflict of interest:
>
> - A substantial ownership interest by a team member or an immediate family member in a competing business or in any outside concern that does business with Papa John's.

- Providing services as a director, manager, consultant, employee or independent contractor to any outside concern that does business with Papa John's, or is in a competing business.

- Offering or accepting any product, gifts or favors that exceed applicable standards in the Company's Conflicts of Interest policy, compensation, loans, excessive entertainment or other similar benefits from any outside concern that does business or seeks to do business with Papa John's or is a competitor of Papa John's.

- Representation of Papa John's in any transaction in which the team member or an immediate family member has a substantial interest.

- Direct or indirect competition with Papa John's in the purchase or sale of property or property rights or interests.

- Taking personal advantage of a business transaction or opportunity that properly belongs to Papa John's.

- A team member being in the position of supervising, reviewing or having any influence on the job evaluation or compensation of an immediate family member or person with whom the team member has a romantic relationship.

> Many conflicts of interest or potential conflicts of interest may be resolved or avoided if they are appropriately disclosed and approved. In some instances, disclosure may not be sufficient and the Company may require that the conduct in question be stopped or that actions taken be reversed where possible. Team members should disclose any situation, transaction or relationship that may give rise to an actual or potential conflict of interest in accordance with the procedures in the Company's Conflicts of Interest policy.

56. Moreover, under the heading "Confidential and Proprietary Information," the Code of Ethics provides the following, in relevant part:

> Team members must protect from disclosure or misuse all confidential, proprietary and other nonpublic information about the Company, its business, customers, suppliers and other team members.
>
> Papa John's legal obligations and our competitive position mandate that our confidential and proprietary information remains confidential.
>
> Confidential and proprietary information generally falls into two categories. The first category encompasses information intended for internal use only. This information typically relates to Papa John's operations – customer lists, pricing policies, formulas, production techniques or "trade secrets" (confidential information used in the course of business to give Papa John's a competitive

> advantage). Papa John's endeavors to keep this information confidential indefinitely.
>
> The second category involves premature release of confidential corporate information that Papa John's routinely discloses to the investing public. This information often gauges the Company's financial or operational performance (such as quarterly financial results of operations) or identifies events that have a significant (or "material") impact on the value of Papa John's stock in the marketplace. Premature disclosure or use of such information may be extremely detrimental to the Company and to investors, and expose the team member involved to onerous civil and criminal penalties.
>
> In addition, team members are expected to protect the confidentiality of information received from or relating to third parties with which Papa John's has or is contemplating a relationship, such as customers and suppliers.
>
> Confidential and proprietary information (whether relating to Papa John's or a third party) must not be disclosed by team members to anyone outside Papa John's, except for a legitimate business purpose (such as contacts with Papa John's outside auditors or attorneys) or where disclosure is legally mandated. Even within the Company, confidential and proprietary information should be discussed only with those who have a need to know the information. A team member's obligation to safeguard confidential and proprietary information continues even after the team member's employment or other relationship with Papa John's ends, regardless of the reason.

57. The Code of Ethics also addresses obligations related to financial reporting under the heading "Maintaining Books and Records," stating the following:

> The Company's books and records must accurately and fairly present the results of operations and the financial condition of the Company. Team members are expected to maintain books and records in appropriate detail to reflect the Company's transactions accurately, fairly and completely. Papa John's policy of accurate, fair and complete recordkeeping applies to all Company records. Accordingly,
>
> - Papa John's financial statements and all books and records on which they are based must accurately reflect all transactions.
>
> - All disbursements and receipts of funds must be properly and promptly recorded, and no undisclosed or unrecorded fund or account may be established for any purpose.
>
> - No false statements or entries may be made for any purpose in Papa John's financial statements or books and records or in any internal or external correspondence, memoranda or communication of any type.

- No action may be taken to, directly or indirectly, defraud, influence, coerce, manipulate or mislead any other employee, officer or director, or any independent auditor or lawyer for Papa John's for the purpose of rendering its financial statements or books and records incorrect or misleading.

- Expense reports must be accurate and complete and include required documentation, such as receipts, to substantiate the expense under the Papa John's Travel, Entertainment & Expense Policy.

Each team member has an obligation to inform his or her immediate supervisor or Papa John's Chief Legal and Risk Officer of any errors, or possible errors or misstatements, in the Company's books and records, including its financial statements, promptly after such errors or misstatements are discovered or suspected.

58. The Code of Ethics additionally addresses disclosure obligations under the heading "Public Disclosure," stating the following:

> The Company's stock is listed on The Nasdaq Stock Market, and, as a result, the Company has a number of disclosure obligations under Nasdaq's rules as well as U.S. federal securities laws. The Company has adopted a number of disclosure controls to help ensure that the Company satisfies its disclosure obligations, including its obligation to make a full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission (SEC) and in other public communications made by the Company. All team members involved in the preparation of the Company's reports and documents filed with or submitted to the SEC and other public communications have a responsibility to assure that such disclosures are full, fair, accurate, timely and understandable and otherwise in compliance with applicable laws, rules and regulations. In addition, team members should inform Papa John's Chief Legal and Risk Officer if they learn that information in any such filing or communication was untrue or misleading at the time such filing or communication was made or if they have information that would affect any such filings or communications to be made in the future.
>
> All Papa John's team members must comply, both in letter and spirit, with all applicable laws, rules and regulations in every jurisdiction in which the Company conducts business. Any suspected or actual violation of any applicable law, rule or regulation should be reported immediately to Papa John's Chief Legal and Risk Officer.
>
> In case of any conflict with any law, rule or regulation of any jurisdiction to that of another, or any questions about the application of any law, rule or regulation, team members should contact Papa John's Chief Legal and Risk Officer.

***

> Team members shall cooperate fully in responding to and facilitating any internal investigation or inquiry or investigation involving any regulatory or law enforcement agency. No team member may ever mislead any investigator or alter or destroy any records in response to an investigation. Team members must also adhere to and abide by any document preservation or litigation hold notices that they may receive from the Company's Legal Department. Any team member who receives notice of or becomes aware of such an inquiry or investigation involving any regulatory or law enforcement agency must contact Papa John's Chief Legal and Risk Officer immediately.

59. In the same section, under the subheading "Securities Laws and Insider Trading," the Code of Ethics provides:

> "Insider trading," occurs when a person trades in a company's securities while aware of material, nonpublic information about that company. Information is "material" if it would influence a reasonable person's decision whether to buy, sell or hold the securities. Common examples of material information include financial results, financial forecasts, possible acquisitions or joint ventures, significant product developments, significant new business and changes in senior management. Information is "nonpublic" if it has not been released to and absorbed by the investing public.
>
> Insider trading is not only unethical, but it is also illegal. The U.S. federal securities laws prohibit insider trading. Papa John's and team members share an interest in avoiding any insider-trading investigation or prosecution, because of the potential for substantial civil and criminal penalties as well as the cost to reputation. Insider trading is a crime punishable by civil penalties of up to three times the profit gained or losses avoided on a transaction, criminal fines of up to $5 million, and up to 20 years in prison. Companies may also face civil penalties for insider trading violations by their employees and other agents.
>
> Team members must comply with Papa John's Insider Trading Compliance Policy, and no team member may trade in Papa John's stock, or the securities of any company, while the team member is aware of material, nonpublic information about Papa John's or the other company. In addition, no team member may share material nonpublic information about a company (including Papa John's) with anyone else or suggest that they buy or sell a company's securities while aware of material, nonpublic information about that company. Team members should address any questions about the application of the securities laws, including insider-trading restrictions, to the Chief Legal and Risk Officer.

60. Furthermore, under the heading "Waivers," the Code of Ethics provides:

> Waivers of provisions of this Code will be granted only in exigent circumstances. Any waivers of provisions of this Code for Papa John's executive officers and members of the Board of Directors must be approved by the Board (or a Board

> committee) and may need to be disclosed promptly to the public (along with the reasons for the waiver) pursuant to applicable law. For team members other than members of the Board and executive officers, only the Chief Legal and Risk Officer (if not involved in the matter) may grant a waiver, and the waiver must be reported promptly to (and in some instances reviewed by) the Board's Corporate Governance and Nominating Committee.

61. Under the heading "Reporting and Violations," the Code of Ethics provides the following, in relevant part:

> Every team member bears responsibility for adhering to the standards in this Code and the Company's other policies and procedures and for raising questions where there is doubt about the best course of action. In addition, every team member bears responsibility for reporting suspected violations of the law, this Code or any of the Company's policies and procedures. In accordance with applicable law, Papa John's will not permit retaliation against any team member for making any such report in good faith or for participating in an investigation of potential misconduct.

62. In the same section, under the subheading "Compliance with Code," the Code of Ethics states the following, in relevant part:

> Failure to comply with the standards contained in this Code and other applicable policies and procedures will subject a team member to corrective action, up to and including separation of employment, termination of contract, referral for criminal prosecution (where applicable) and reimbursement to Papa John's for any losses or damages resulting from the violation (where applicable).
>
> The Company may take prompt corrective action:
>
> - Against any team member who authorizes or participates directly in actions that constitute a violation of this Code.
> - Against any team member who fails to cooperate with any investigation concerning a possible violation of this Code.
> - Against the violator's managers or supervisors when the circumstances of the violation reflect inadequate supervision or a lack of diligence.
> - Against any manager, supervisor or other team member who retaliates, directly or indirectly, or encourages others to do so, against a team member who reports a violation.
> - Against any team member who knowingly makes a false report of an alleged violation of this Code.

63. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue and/or cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

64. The Company also maintains an audit committee charter (the "Audit Committee Charter"). The Audit Committee Charter details that the purpose of the Company's Audit Committee "shall be to represent and assist the Board in fulfilling its oversight responsibilities for the accounting, financial reporting and internal control functions of the Company and its subsidiaries[.]" Specifically it notes that the Audit Committee's responsibility includes the following in relevant part:

- the Company's accounting and financial reporting processes;
- the independent auditors' qualifications, independence and performance, including the audit of the Company's financial statements;
- the Company's internal audit function;
- the Company's internal control over financial reporting and disclosure controls and procedures; and
- the Company's compliance with legal and regulatory requirements, including, without limitation, those that impact financial reporting.

65. In the same section, the Audit Committee Charter further provides that:

> The Committee's role is one of oversight. Company management is responsible for the preparation of the Company's financial statements, for maintaining appropriate systems for accounting and internal controls, and for monitoring compliance with the Company's policies and rules regarding business conduct. The Company's independent auditors are responsible for planning and conducting proper audits and reviews of the Company's financial statements. It is the joint responsibility of Company management and the independent auditors to ensure that the Company's financial statements comply with generally accepted accounting principles.

66. Furthermore, under the heading "Authority and Responsibilities," the Audit Committee Charter describes the Audit Committee's responsibilities to its oversight of both internal and independent audits, stating the following in relevant part:

> 5. **Internal audit.** The Committee shall review the responsibilities, resources, functions, and performance of the Company's internal audit department. The Committee shall review and approve the Company's appointment or change of the internal corporate audit staff leader and shall review and approve, on an annual basis, the Internal Audit Charter. The Committee shall discuss with the internal auditors the overall scope, resources and plan for their audit, and approve the audit plan for the upcoming year.
>
> 6. **Accounting policies and disclosures.** The Committee shall discuss with the independent auditors the matters required to be communicated as described by PCAOB Auditing Standard No. 1301 (Communication with Audit Committees), including but not limited to any difficulties encountered in the course of the work, any restriction on the scope of the independent auditors' activities or on access to requested information, any significant disagreements with management, and the independent auditors' judgment as to the quality of the Company's accounting principles, setting forth significant financial reporting issues, judgments and disclosures in financial statements. The Committee shall review with management and the independent auditors any significant changes in the selection or application of accounting principles.

(Emphasis in original).

67. Under the same section, the Audit Committee Charter also notes the Audit Committees' regulatory and compliance responsibilities, stating in relevant part:

> 8. **Legal and regulatory matters.** The Committee shall review any legal and regulatory matters that may have a material impact on the Company's financial statements, related Company compliance policies and programs and reports received from regulators.

> 9. **Compliance.** The Committee shall oversee the Company's compliance program with respect to legal and regulatory requirements and oversee the Company's policies and procedures for monitoring compliance.

(Emphasis in original).

68. Moreover, the Audit Committee Charter addresses responsibilities related to financial reporting and related disclosures, among others, providing the following in relevant part:

> 10. **Financial reporting controls.** The Committee shall discuss with management and the independent auditors the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures. The Committee shall review management's report on internal control over financial reporting and the independent auditors' attestation and report on management's assessment as required under Section 404 of the Sarbanes-Oxley Act.
>
> 11. **Enterprise risk management.** The Committee shall provide oversight of the Company's overall enterprise risk management function. The Committee shall discuss with management and report regularly to the full Board of Directors on the Company's policies and practices with respect to risk assessment and risk management and discuss the Company's risk exposures, including top risks, and the processes to identify, assess, manage and mitigate risks.
>
> ***
>
> 13. **Review of periodic financial statements, earnings releases and management's disclosures and certifications.** The Committee shall review with management and the independent auditors the Company's annual and interim financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and other documents containing such statements, each prior to filing with the Securities and Exchange Commission or public distribution and shall recommend to the Board whether the annual financial statements should be included in the Annual Report on Form 10-K. In connection with each periodic report, the Committee shall review management's disclosures and certifications required under the Sarbanes-Oxley Act. The Committee also shall discuss with management and the independent auditors the Company's earnings press releases prior to each release, including the content, presentation of information and the use of any non-GAAP financial information. The Committee shall also oversee the Company's policies and practices with respect to publicly disclosed non-GAAP measures.
>
> 14. **Complaints concerning financial matters; investigations.** The Committee shall establish and oversee the Company's procedures for the receipt, retention and handling of complaints received by or on behalf of the Company regarding accounting, internal accounting controls, auditing, federal securities laws or any other financial matters, including the confidential, anonymous submission by the

> Company's employees of concerns regarding questionable accounting, auditing and legal and regulatory compliance matters. The Committee is authorized to investigate any other matters brought to its attention within the scope of its duties.
>
> 15. **Proxy statement report.** The Committee shall provide a report of the Committee required by SEC rules to be included in the proxy statement for each annual meeting of the Company's stockholders.

(Emphasis in original).

69. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## <u>THE INDIVIDUAL DEFENDANTS' MISCONDUCT</u>

***Relevant Background***

70. Papa John's operates and franchises pizza delivery and takeout restaurants across North America and various international markets.

71. The Company is chiefly engaged in the QSR industry. The QSR industry is highly competitive across pricing, service, location, food quality, product innovation, and customer loyalty programs, among other metrics. Notably, the Company's annual report on Form 10-K filed

on February 26, 2026, noted that some of the Company's "competitors have been in existence for longer periods than Papa Johns, have substantially greater resources than Papa Johns and can have higher levels of restaurant penetration, aggressive promotional campaigns and brand awareness in markets where we compete."[3]

72. The Company reports its finances in four segments: Domestic Company-owned restaurants, North America franchising, North America commissaries, and International.

73. Against this market backdrop, leading up to and throughout the Relevant Period, the Company was focused on implementing its strategic initiatives to improve its "value perception and enhance the customer journey across our digital platforms to increase conversion and reduce friction within the customer experience."[4] The Company's strategic priorities include "Focusing on our core product proposition and improving innovation across the barbell", "Amplifying our marketing message", "Investing in our technology", "Differentiating our customer experience", and "Partnering with and evolving our franchisee base."

74. Additionally, in December 2025, the Board approved the first phase of the Company's business transformation program which focused on reducing non-consumer facing spending and building upon the Company's restaurant portfolio.

75. Later in 2026, the Board also approved the second phase of the Company's transformation initiatives which centered on optimizing the Company's restaurant portfolio and improving the profitability of its restaurant level operations.

**False and Misleading Statements**

***August 7, 2025 Press Release and Earnings Call***

---

[3] https://www.sec.gov/ix?doc=/Archives/edgar/data/0000901491/000162828026011965/pzza-20251228.htm

[4] *Id.*

76. The Relevant Period began on August 7, 2026, when the Company published a press release announcing its financial results for the second quarter of Fiscal Year 2025 ("Q2 2025 Press Release"). The Q2 2025 Press Release highlighted that the Company's "North America comparable sales increased 1% from a year ago as Domestic Company-owned restaurants were flat and North America franchised restaurants were up 1%; International comparable sales increased 4% compared with the prior year second quarter."

77. Defendant Penegor is also quoted in the Q2 2025 Press Release as emphasizing the viability and success of the Company's strategy in its North America segment, stating:

> Papa Johns second quarter results exceeded our expectations and ***are evidence that our strategy is working.*** We returned to comparable sales growth in North America and achieved strong sales growth internationally, driven by transaction gains as we win more customer visits with a focus on our core pizza business[.]
>
> Our progress in the second quarter reinforces my confidence that ***we are on the right track to deliver significant, sustainable profitable growth and increased value for all Papa Johns stakeholders***[.]

78. The same day, the Company held an earnings call for the second quarter of Fiscal Year 2025 ("Q2 2025 Earnings Call").

79. During the Q2 2025 Earnings Call, Defendant Penegor highlighted the Company's ongoing positive transformation, stating in relevant part:

> ***The progress we've made is substantial. For example, we've successfully returned the company to positive comparable sales and transaction growth in North America***. With our barbell strategy and enhanced loyalty program in place, our brand strength has improved significantly. And strategic investments are enabling us to deliver great experiences for our customers.
>
> Taken together, ***I am confident we are on the right path towards profitable growth***. Our goal is to be the best pizza makers in the business, and we are laser-focused on continuing to execute our strategy to grow restaurant sales, generate sustainable profits through the system and build long-term value for all of our stakeholders.

***

> ***Our second quarter results, which exceeded our expectations are evidence that our strategy is working. The North America business returned to positive comparable sales, ending the quarter up 1%.*** We also delivered sequential improvement across several key international markets, driving 4% comparable sales growth in Q2.

80. During the Q2 2025 Earnings Call, Defendant Penegor further touted the Company's financial prospects and the viability of the Company's current strategic priorities, stating, in relevant part:

> ***First, we are focused on improving our core product proposition and premium menu innovation throughout our restaurants.*** We're building a menu to not only capture the hearts and stomachs of customers, but also generate margins that improve profitability for our franchisees. Our consumer research consistently shows that exciting menu innovations bring in new customers.
>
> ***
>
> Turning now to the progress we've made on our ***second priority***, which is ***to amplify our marketing message***. We've been hard at work creating a marketing message that ***speaks to Papa John's differentiation among QSR pizza companies***. At the end of June, we launched the second chapter of our popular Meet the Makers marketing campaign, leaning into the 6 simple ingredients of our fresh, never frozen original dough. Six simple ingredients is a strong point of differentiation with high importance among consumers.
>
> Our customers have told us that using simple, fresh ingredients is our biggest and most important differentiator, and we've doubled down on that message in our national marketing campaign. Consumers want high-quality pizza with real ingredients and ***our messaging strategy meets them where they are***, emphasizing our points of differentiation and showcasing select core products at relevant price points. This will be part of our long-term strategy to win customers and deliver compelling four-wall economics. Ultimately, we think the world deserves better pizza, and we are here to deliver it.
>
> ***
>
> Our third strategic priority is investing in our technology infrastructure. Under Kevin Vasconi's leadership, we are implementing our technology road map with the goal of reestablishing Papa John's as a best-in-class technology leader in QSR. By better utilizing data and leveraging AI, we believe we can create a more seamless experience across our digital assets and own channels and better connect with customers.
>
> ***

> Our ***fourth priority, differentiating our customer experience across all of our channels, underpins each of our strategic pillars***. Starting with our loyalty program. We continue to benefit from the lowering of our redemption threshold late last year and allowing members to unlock Papa Dough faster. Though this enhancement decreased our overall order ticket by approximately 100 basis points in the quarter, the benefits far outweigh the ticket impact.
>
> ***
>
> Our fifth strategic priority is partnering with and evolving our franchisee base to drive profitable growth through market share gains, accelerating restaurant development in our most impactful markets and sustainably improving our restaurant economic model.

81. Moreover, during the Q2 2025 Earnings Call, Defendant Thanawala discussed the potential impact of shifting consumer attitudes, but nonetheless reiterated the Company's 2025 financial guidance, stating in relevant part:

> For 2025, we continue to expect system-wide sales to increase between 2% and 5%. From a comparable sales perspective, we still anticipate that North America comparable sales will be flat to up 2% in 2025. ***Through the first 5 weeks of the third quarter, North America comparable sales are down approximately 1% as we've seen a more cautious consumer and softer carryout business.***
>
> ***Given our plans to leverage our barbell strategy with strong value messaging and a compelling full margin product, we expect that North America comparable sales will accelerate through the remainder of the third quarter. We anticipate further acceleration in the fourth quarter as we build momentum and layer in new product innovation.***
>
> Internationally, we are pleased with the continued improvement that we are seeing across our restaurants. Given recent trends and the operational strength in our priority markets, we are raising our 2025 international comparable sales growth outlook to a range of 2% to 4%.

82. During the Q2 2025 Earnings Call, an analyst raised a question regarding the Company's second quarter financial results, to which Defendant Penegor stated the following, in relevant part:

> [Q:] You mentioned 2Q exceeding your expectations. North America comps were a little ahead of what it seems like you had expected. Where do you think you're getting more traction than you anticipated across those initiatives?

And then just kind of as a follow-up. I know it's only 1 month, so I don't want to make too much of that, but what gives you confidence in the reacceleration over the balance of the year based on what's in your pipeline?

[A: Defendant Penegor] Yes. Thanks for the question, Andrew. ***Very proud of the work the team has done to get North America growing again at plus 1% on same-restaurant sales comps***, really on the heels of transaction growth being up 1%. So we are bringing in more customers more often. I think it's a combination of everything that we have out there, return to a more traditional barbell, had some innovation for the first time in a while, which helped on the high end of the barbell with the Cheddar Crust Pizza. Putting Shaq-a-Roni as more permanent long-term item has been a positive.

But the foundational work that we've done over the last 9 months really makes sure we have the tools at our disposal to lean into CRM to make sure we can better connect to our consumer, to leverage our loyalty program, which is driving a lot of frequency and we continue to gain members on that front. We're seeing some really nice growth in our loyalty program.

And as we look forward, the opportunity is to really leverage innovation a little bit more, to recruit customers back into our brand. We know if we can bring some lapsed in, we can bring some new in, we can get them converted into our loyalty program and we can grow and drive some nice momentum in our business moving forward.

***Yes, we're in the early innings of third quarter. More cautious consumer. We're watching in our carryout business probably started a little bit softer than we had hoped for at the beginning of the quarter***, but we can quickly check and adjust on that front. We're lapping over at the beginning of the quarter some heavier promotional activity that supported some of our rhythm breakers, Papadias, Papa Bites last year, ***but our core pizza business, which was up 6% in the second quarter, continues to grow nicely into the third quarte***r. So we're really feeling good about the core business.

And we just launched some more innovation. We've got Garlic 5-Cheese at $11.99 price point just launched coming up. We've got an on-trend shareable pizza format with a new lineup of dipping sauces. And we got in test what we're calling the Grand Papa, which is our biggest pizza ever and we're excited about that one, too.

***So we've got a lot at our disposal to continue to compete really well in the back half of the year. And you will see sequential improvement in our business throughout the back half*** to deliver on our commitment in North America flat to plus 2%. And then importantly, we still have a lot of momentum on international, right? We ended up calling up the year on international was flat to 2% to 2% to 4%. ***And the momentum that we saw in the second quarter continues into the third quarter.***

***November 6, 2025 Press Release and Earnings Call***

83. On November 6, 2025, the Company issued a press release announcing its financial results for the third quarter of Fiscal Year 2026 ("Q3 2025 Press Release").

84. The Q3 2025 Press Release announced a 3% decline in the Company's North American Comparable sales. Defendant Penegor is quoted in the Q3 2025 Press Release as assuring the investing public of ongoing efforts to react to market changes, stating the following in relevant part:

> Our third quarter results reflect strong performance and building momentum of our transformation work in International markets, offset by ***softer North American sales given current consumer sentiment and a promotional QSR marketplace***. We are ***sharpening our value proposition and rebuilding our innovation pipeline to add new sales layers to our business. This relentless flow of innovation will allow us to better respond to consumer needs, leveraging our competitive advantages of quality, craftsmanship, and freshness at an accessible price***.
>
> ***As we execute our transformation strategy, we are also strengthening our competitiveness in strategic markets and developing a world-class technology platform to differentiate the customer experience.*** Concurrently, we are taking action to remove non-customer facing costs from the business and build a more nimble, efficient organization. We have identified substantial savings, and we expect to identify additional efficiency opportunities as our review progresses. Papa Johns is a strong brand with a healthy balance sheet, ***and I'm confident that the work underway will position us to drive sustainable, profitable growth and create value for our customers, franchisees, and shareholder.***

85. The same day the Company held an earnings call for the third quarter of Fiscal Year 2026 ("Q3 2026 Earnings Call") during which Defendant Penegor addressed new initiatives to keep the Company competitive, stating in relevant part:

> Within North America, core pizza sales were flat. We sold 3% more pizzas and 4% more pizzas per order, but total pizza sales were effectively flat as order mix shifted to more medium pizzas and fewer added toppings. ***The majority of North America sales pressure was driven by declines in product outside of our core pizza offering, including wings, bread sides, Papadias and Papa Bites.***
>
> As consumers are pressured, they tend to control their spend by focusing on center of plate rather than adding sides and desserts. ***As part of our product innovation***

> ***work, we are taking action to develop more compelling sides and desserts at more accessible price points. I'll share more about that in a moment.***
>
> ***
>
> Ultimately, ***we are positioning Papa John's to compete better in 2026 and beyond. We are aligning our system around a more comprehensive value proposition to address near-term consumer pressure.*** We are building a stronger, more impactful product pipeline, with a relentless flow of innovation built around 3 major new platforms to extend our addressable market and expand margin, including reimagined sides to drive add-ons.
>
> ***We are strengthening our competitiveness in strategic markets, both domestically and internationally.*** We are removing noncustomer-facing costs from the business. We are creating a more nimble, efficient organization. We are standing up a technology platform to differentiate the customer experience. We are building a more efficient supply chain and improving our food cost, and we are accelerating our North American refranchising program.
>
> ***We are confident that our transformation work will ultimately position Papa John's to generate sustainable, profitable growth across our portfolio, better respond to customer needs and effectively navigate a variety of consumer environments, all while maintaining a healthy balance sheet.***

86. Defendant Penegor further touted the Company's "distinct competitive advantage to win new customers[.]" Specifically, Defendant Penegor stated the addressed the following strategic initiatives, in relevant part:

> ***While our transformation is in the early innings, we are making progress***. And as you've heard today, we are committed to accelerating the momentum, including pursuing cost actions, faster refranchising and meaningful operational improvements. Let me share more.
>
> First, we are relentlessly focusing on our core product proposition and premium innovation. Our culinary and product development teams have rebuilt and reinvigorated our innovation framework, which is now grounded on 3 approaches: form innovation, size innovation and platform innovation.
>
> In September, we launched Papa Dippa, ***the first innovation under the new framework, showcasing form innovation***. Papa Dippa is an on-trend shareable pizza cut into strips made specifically for dipping. Our newest innovation launched this week is built around size. The Grand Papa is our largest pizza ever with delistyle pepperoni and large foldable slices, perfect for sharing.

87. Defendant Penegor further continued with a discussion of the Company's anticipated financial position, stating in relevant part:

> ***In 2026, we expect to have a consistent flow of impactful innovation at compelling price points, which will better allow us to drive sales in a challenging consumer environment and extend our addressable market.*** For example, we are reimagining our side offerings and developing more sides at accessible price points to drive add-on sales and margin expansion.
>
> Additionally, our 2026 innovation pipeline begins to expand our aperture beyond traditional QSR pizza and adds new sales layers to our business, including menu items more akin to what you would find at your neighborhood pizzeria. ***Combining this kind of right price innovation with Papa John's quality, craftsmanship, variety and freshness results in a distinct competitive advantage to win new customers.***

88. Defendant Thanawala also spoke during the Q3 2026 Earnings Call and highlighted his confidence in the Company's ongoing strategic initiatives, in relevant part:

> As Todd discussed, North America comparable sales decreased 2.7% in the third quarter, with the majority of sales pressure driven by declines in products outside of our core pizza offering. ***To improve this trend, and drive add-ons and ancillary sales, we are rebuilding our innovation pipeline, including reimagining our sides offering.***
>
> ***
>
> ***We've revised our outlook to reflect the impact of a softer consumer backdrop and a more promotional QSR marketplace, which we expect to persist through the remainder of the year and into 2026.***
>
> ***
>
> Looking ahead, we are positioning Papa John's to compete better in 2026, play the game differently, while continuing to transform the brand and fuel sustainable profitable sales growth in the future. Papa John's is a strong brand, with a healthy balance sheet, and the work underway will position us to drive long-term earnings power across all aspects of our organization. ***We are confident in our strategy. We recognize the substantial upside ahead, and we are moving forward with excitement and focus as we transform the business.***

89. During the question-and-answer portion of the Q3 2025 Earnings Call, Defendant Penegor reiterated his confidence in the Company's business prospects and assured investors of

the Company's ability to respond to changing consumer focuses and promotional market environment during the following exchange, in relevant part:

> [Q:] I wanted to ask, Todd, a little bit over a year since you joined Papa John's. I'd be curious to get your assessment of the turnaround progress and where you are today versus where you thought you might have been when you set out on this journey? And where do you feel like you're maybe farthest along? And what areas maybe been a little bit slower to materialize?
>
> [A: Defendant Penegor] Yes. Thanks for that question, Andrew. And as you think about the things that I feel good about, right, over the course of the last 14, 15 months, ***we really improved the value proposition and perception of the Papa John's brand. We continue to improve the quality perception and our brand health***, which are positive for the long run, and those are foundational work that we'll continue to do.
>
> ***Our innovation pipeline needed to be rebuilt. You're starting to see some of that news come to life here at the back half of 2025. But really excited around a steady dose of innovation into 2026, not just around core pies, but around other occasions that can help drive the business, whether that be reimagined sides or other handheld opportunities into the future.***
>
> So, I think there's opportunities to do that. The work we've done to really work our oven calibration and perfect bake to make sure we're making better core pizzas and working with our franchise community to deliver quality product time and again, work always to do on that. But that has set a strong foundation for us to continue to lean into, and it allows us to really open up the opportunity to innovate even more as we get time and temperature set right in our ovens in the restaurants.
>
> In our international business, we've made a tremendous amount of progress. A lot of heavy lifting was done just before I got here. We're starting to see the fruits of all of those hard work, and it's really driving our business, and we got really some strong momentum in that business across the globe, and it's widespread.
>
> ***As you think about where the latest environment is around the consumer, around the competitive landscape, we need to make sure that we can continue to compete hard on both sides of the barbell***. Quality is always going to be important. ***We need innovation to bring in those laps to new customers, but we also need to make sure we've got a really balanced barbell to make sure we can compete on the value proposition side too.*** Do it our way, do it appropriate for the Papa John's brand, do it in a way that brings in more customers more often to drive transactions for the long run. And that's where the focus is going to continue to be.
>
> ***You'll see that in the promotional cadence that we have year to go and into next year. And you'll also see that in how we bring our innovation to life to make sure they're priced appropriate for where the consumer is today. So, we're going to***

> ***meet the consumer where they're at today. We'll continue to build this brand for the future.***

*November 18, 2025 Press Release*

90. On November 18, 2025, the Company issued a press release ("November 2025 Press Release") announcing that Defendant Thanawala had been "promoted to Chief Financial Officer and President, North America." The November 2025 Press Release also noted that the "Company's International business will be led by Chris Lyn-Sue," who has also been promoted internally.

*February 26, 2026 Press Release and Earnings Call*

91. On February 26, 2026, the Company published a press release announcing its financial results for the fourth quarter and full Fiscal Year 2025 ("FY 2025 Press Release"). The FY 2025 Press Release stated that "North America comparable sales decreased 5% as Domestic Company-owned restaurants were down 6% and North America franchised restaurants were down 5%; International comparable sales were up 6%, all compared with the prior year fourth quarter."

92. The FY 2025 Press Release also note that for the full Fiscal Year 2025, North American sales decreased by 2%, which met the previously reduced guidance from the third quarter.

93. The same day, the Company held the FY 2025 Earnings Call, during which Defendant Penegor touted the Company's progress through strategic initiatives, stating in relevant part:

> 2025 was a year of transformation for Papa John's as we made improvements across the company to our brand health, technology platform, innovation pipeline, customer experience, restaurant fleet and cost structure. These actions, together with key leadership appointments and organizational changes, ***represent meaningful progress against our transformational objectives***. We have ***substantially improved our brand health as well as our value and quality perception with our customers, which will translate into market share gains***.

94. Moreover, Defendant Penegor addressed the Company's business and growth prospects in 2026 and stated that the Company's strategic initiatives will provide support in achieving these prospects, stating in relevant part:

> As we look to 2026, ***we are positioning the business to win in a category that has staying power and growth opportunities***. Pizza is a go-to for families and friends in everyday moments, special occasions and gatherings and that deep-rooted consumer affection ensures pizza remains one of the most durable food categories. By being the best pizza makers in the industry, I am confident Papa John's will capture this global market opportunity. ***Our 2 largest opportunities to gain share are: building on the advancements we've made in value perception and leveraging our rebuilt innovation pipeline to win new customers, elevate our pizza order mix to more premium pizzas, drive add-ons and expand our total addressable market.***
>
> ***
>
> Part of our product innovation work in 2026 is centered around ***crafting compelling side items at accessible price points, which we believe will entice customers to look beyond the center of the plate and drive benefits to total ticket, sales and 4-wall margins***.
>
> ***
>
> ***With the competitive dynamics in the QSR marketplace, we are equally focused on sharpening our marketing message***. We know pizza is a game played nationally, but won locally. I'm thrilled to share that ***we have reestablished co-ops across 50 markets in the United States, which includes the majority of our priority markets. These co-ops enable franchisees across regions to pool resources for more effective localized targeting and brand support***. Now nearly half of our North American system-wide sales are supported by an advertising co-op with collaborative local campaigns.
>
> ***
>
> ***We have established clear success criteria and are closely tracking returns on these investments and we are already seeing green shoots***. Our international business provides a compelling proof point delivering 5 consecutive quarters of positive comparable sales through focused investment in product, customer experience and priority markets. In summary, ***as we accelerate our transformation, we are making visible progress executing our strategy. We are confident in our direction and in our ability to deliver sustainable profitable long-term growth and capitalize on opportunities across the category.***

95. During the FY 2025 Earnings Call, Defendant Thanawala highlighted the Company's ability to react to shifting consumer sentiment and assured investors that the Company's strategy would boost brand momentum despite a recent slip in market share. In particular, Defendant Thanawala stated the following:

> For 2025, we met or exceeded our updated financial targets for system-wide sales, comparable sales growth and adjusted EBITDA as we ***pivoted during the second half of the year to amplify our value proposition in response to a weaker consumer backdrop and intense competitive promotional activity while prudently managing our expenses***. We also opened 279 new restaurants in fiscal 2025 with 96 restaurant openings in North America and 183 in international markets.
>
> ***In 2025, our U.S. market share slightly softened*** reflecting a system-wide sales decline of just under 1%. As Todd described, ***we are taking actions to further increase our agility as we move throughout 2026 and build momentum behind our transformation***. For the fourth quarter, global system-wide restaurant sales were $1.23 billion, down 1% in constant currency as higher international comparable sales and 1% global net restaurant growth were more than offset by lower comparable sales in North America.
>
> North American comparable sales decreased 5% in the fourth quarter driven by a 5.5% decrease in transaction comps across our restaurants. Carryout grew 1%, but was more than offset by declines in total delivery. The international team delivered another exceptional quarter with comparable sales improving 6%. ***We saw continued momentum across our key markets driven by new menu offerings, aggregator expansion and improved brand and marketing performance.*** Total consolidated revenue for the fourth quarter was $498 million, down 6% as lower revenue at our domestic company-owned restaurants, North America commissary and all other business units was partially offset by higher international revenues.

96. Defendant Thanawala further continued by addressing the Company's 2026 financial outlook. In this regard, Defendant Thanawala noted that the guidance indicated a continued mild decline in North American sales, but nonetheless assured investors that the decline was significantly reduced by the Company's "innovation pipeline," in relevant part:

> For 2026, we expect global system-wide sales to range between flat and low single-digits decline. ***For North America, we expect comparable sales to be down 2% to 4%. Our guidance reflects both the benefit of innovation pipeline and considerations around the current cautious consumer environment we expect to persist throughout 2026.*** These factors are expected to influence our comparable sales trends through the year. Quarter-to-date comparable sales are down mid-

single digits and we expect to end the first quarter in that range. ***We expect Q1 to be the softest quarter followed by improved trends in the second half of the year supported by the benefits of our product innovation, marketing co-ops and new aggregator marketing strategy.***

***

For 2026, we expect consolidated adjusted EBITDA to be between $200 million and $210 million. Recall that 2025 and 2026 are investment years as we support our transformation initiatives. ***In 2026, we expect to invest approximately $22 million in supplemental marketing and franchisee subsidies to support our menu strategy and enhance franchisee profitability as we lean into our promotional strategy in this year's innovation calendar.*** As our transformation advances and we continue to stand up local co-ops, we do not expect to continue this $22 million investment after 2026.

97. Moreover, during the question-and-answer portion of the FY 2025 Earnings Call, an analyst asked the basis underlying the Company's 2026 outlook compared to actions of the company's competitors. Specifically, the analyst asked the following, to which Defendant Penegor responded, in relevant part:

[Q:] As it relates to your same-store sales, one of your competitors suggest that the QSR pizza industry as a whole is pretty stable, in fact growing and your same-store sales guidance for '26 is a 2% to 4% decline. And the question is just what is holding you back from holding or taking share in 2026 in your view? I realize you see a cautious consumer out there, but it seems like your guidance does assume a market share decline in 2026 and just would like your commentary on that.

[A: Defendant Penegor] As we think about 2026, our opportunity is really about bringing our innovation calendar to life. ***As you think about where some of the opportunities have been for us over the last year or so, it was really around recruiting new customers to our brand and we do believe that innovation is going to play a big role with that.*** We're actually doing a nice job continuing to protect and drive frequency with our existing customer and you saw that in the prepared remarks with the work that we've been doing in Papa Rewards and the targeted CRM offers. But we do think as we go through this year bringing to life pan pizza, we're already seeing a nice mix in that product.

***The opportunity is to wear it in and really engage new customers into our brand and it's a great product once they try it and we're seeing good repeat rates early in the game.*** The sandwich opportunity is an opportunity for us to start to expand our total addressable market because we don't play in that category yet. It's doing really well in test so I would expect to see that coming to life during the course of this year. ***We know we have an opportunity to drive add-on with affordable sides.***

> So we've got that news coming through this year. ***And the single-serve pizza opportunity is an opportunity for us and that will come with a fun property tie-in.***
>
> ***So those are things that we know we have to drive on innovation to recruit new customers***. We also know we got to really compete better at the local level and ***we've been working hard over the course of the last 18 months as I've been here to get the co-ops back up. And as you heard in the prepared remarks, we now got 50 co-ops representing half the system sales in the U.S. up and running***. So all of those are the nice tailwinds in our business that we're going to see during the course of this year. Why do we have the guidance that we have with all of that news? Well, we've got a couple of things that we know we need to evolve and change.
>
> We talked about pulling some of our rhythm breakers off the menu to really drive a focus on being not just the best pizza makers in the business, but over time being the best bakers. And the elimination of Papadias and Papa Bites will have an impact on our business, but it's absolutely the right thing to do from an ops complexity to create great service experiences time and again moving forward. So we're going to be focused on doing that. And ***we know we got to compete even stronger in the 3P channel and that's not just national offers, that's working local and the co-ops will help us really position to do that even stronger at the local level.***
>
> So we're going to do the things that are right for the long term of the business, bring news, continue to drive our core pizza business. The good news is we sold 4% more pizzas in 2025 on a full year basis than we did the year before even though we saw some of the mix trade-downs and we think we'll continue to see some of the mix trade-downs from large and specialty into medium, which provides a little bit of pressure on our business. But ***we think it's a prudent approach to the business. We're managing our cost structure appropriately. We continue to invest to bring the news to life. And we really think that kind of prudent approach to our business will set ourselves up for long-term success***. . . .

98. Following Defendant Penegor's response, Defendant Thanawala also added the following, in relevant part:

> [A]s we think about dimensionalizing the 2025 comp, 180 basis points of our comp pressure came from our sides business, 50 basis points were from channel mix and the balance was really a mix shift within the pizzas itself from larger sizes to some medium sizes and a little bit of a mix out of specialty into create your own. So there are a couple of dynamics there. But as Todd [Defendant Penegor] mentioned, ***we're really focused on like wearing in our innovation strategy and competing well.***

99. During the FY 2025 Earnings Call, another analyst raised two questions regarding the strategy and considerations when competing on value, to which Defendant Penegor responded with the following, in relevant part:

> [Q:] Isiah Austin on for Sara. Just briefly, how do you guys think about competing on value? I know it's kind of derivative of the previous question, but how do you think of competing on value when you think of going against a larger scale competitor? And then I just have a quick follow-up.
>
> [A: Defendant Penegor] ***I think on competing on value, we really think about how do we meet the consumer where they're at and we did that in partnership with our franchise system in the fourth quarter.*** Our 50% carryout offer met them where they're at and that's a great offer and a great overall service experience because we do really well on the carryout side. Having $9.99 create your own did meet the consumer where they're at. ***But we have to compete on both ends of the barbell and that's why bringing this innovation is so important. And you can see that as we come out with a compelling price point on pan at $11.99, it is still a trade-up from our $9.99 create your own offering. So that does help margin and check and dollars.***
>
> So it's going to have to be a balance. The work we're doing on innovation to have affordable sides certainly helps us on value. ***But what we really need to do is continue to recruit new customers*** because if we can get them into our rewards program, we're driving -- we see higher frequency and there's a lot of value that can be created with Papa Dough redemptions that we've seen nice uptick in the Papa Dough redemptions. And our frequency, as we said on the call, is 2.5x more in that with a loyalty member than a non-loyalty member. So we're just going to have to continue to drive folks over into that channel. ***And as we said earlier, we're going to have to make sure that we've got the appropriate offers in 3P to compete even better to make sure we've got not just our fair share of the pizza category, but our fair share of QSR in the 3P channel.***

100. Defendant Thanawala also added to Defendant Penegor's response stating, in relevant part:

> And just like as a reminder, in our prepared remarks, we talked to an opportunity for capturing 200 basis points of margin upside on a 4-wall basis in the system with 160 basis points coming from supply chain and the balance coming from labor and market efficiencies. ***So even in this value-centric world, we're pulling levers to continue to maintain and drive our 4 walls***. And just more broadly from a 4-wall standpoint, in December 2024 we provided a figure that our domestic company-owned restaurant 4-wall margins were $150,000 and as we look at the numbers for year-end 2025, we're at $135,000.

> So we went slightly backwards, but like we have a clear plan that we just laid out to reaccelerate there. And then just from like a broader system standpoint, when we look at the Top 50% of our fleet right now in the U.S., AUVs are roughly $1.4 million at a 12% EBITDA margin. And our Top 75% of our fleet is at a $1.25 million AUV roughly at a 10% EBITDA margin. So we see opportunities to continue to accelerate 4-wall margins and compete by having this balance of value messaging that Todd referenced and wearing in our innovation calendar.

***March 26, 2026 Proxy Statement***

101. On March 26, 2026, the Company filed the 2026 Proxy Statement. The 2026 Proxy Statement was solicited by Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

102. The 2026 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller to the Board; (2) the ratification of Ernst & Young LLP ("EY") as the Company's independent auditor for Fiscal Year 2026; (3) the compensation of the Company's named executive officers, on an advisory basis; (4) an amendment of the Company's Certificate of Incorporation to remove supermajority voting provisions; and (5) an amendment of the Company's Certificate of Incorporation to reduce the special meeting ownership threshold to 25%.

103. With respect to the Company's Code of Ethics, the 2026 Proxy Statement provided the following, in relevant part:

> The Company's Code of Ethics and Business Conduct, which is the Company's code of ethics applicable to all directors, officers and team members worldwide, embodies the Company's global principles and practices relating to the ethical conduct of the Company's business and its longstanding commitment to honesty, fair dealing and full compliance with all laws affecting the Company's business.
>
> The Board has established procedures for any person, including a team member, to submit confidential and anonymous reports of suspected or actual violations of the Company's Code of Ethics and Business Conduct relating, among other things, to:
>
> - violations of the federal securities laws;

- fraud or error in the Company's accounting, audit or internal controls, financial statements and records; and

- misconduct by any member of the Company's senior management.

104. Regarding the "Board Leadership Structure and Risk Management," the 2026 Proxy Statement stated the following, in relevant part:

> The key responsibilities of the Board include developing the strategic direction for the Company and providing oversight for the execution of that strategy by management. The Board has an active role, as a whole and also at the committee level, in overseeing management of the Company's risks. The Board regularly reviews information regarding the Company's financial, strategic and operational issues, as well as the risks associated with each, and that oversight includes a thorough and comprehensive annual review of the Company's strategic plan and Enterprise Risk Management program.
>
> At the committee level, risks are reviewed and addressed as follows:
>
> - The Audit Committee oversees management of financial risks; legal and regulatory risks; franchise risks; food safety, information technology and cybersecurity risks; as well as the Company's Enterprise Risk Management program, reporting on such matters to the full Board. The Audit Committee's agendas include discussions of individual and emerging risk areas throughout the year, and, through its oversight of our Enterprise Risk Management program, the Audit Committee monitors management's responsibility to identify, assess, manage and mitigate risks. Our Enterprise Risk Management program is comprised of a cross-functional, management-level Enterprise Risk Management team that helps establish a culture of managing and mitigating risk and coordination of risk management between our executive team and the Board. Specifically, with respect to oversight of technology and cybersecurity risks, our information security officer provides regular formal updates to the Board and Audit Committee on potential cybersecurity threats and the progress of our ongoing security and privacy programs. The Audit Committee reviews with management and reports to the full Board with respect to material information on security matters and risks and management's actions to monitor and address identified areas for improvement.
>
> - The Compensation Committee is responsible for overseeing the assessment and mitigation of risks relating to the Company's compensation policies and practices and incentive compensation arrangements for its employees, and also oversees succession planning and human capital management. The Compensation Committee reviews our compensation policies and practices to determine whether they subject us to unnecessary or excessive risk. As a result of that evaluation, including a review of the plan design and

governance aspects of our compensation programs discussed below in the Compensation Discussion and Analysis, the Compensation Committee concluded that the risks arising from those policies and practices are not reasonably likely to have a material adverse effect on the Company.

- The Corporate Governance and Nominating Committee manages risks associated with potential conflicts of interest and reviews governance and compliance issues with a view to managing associated risks, including oversight of our compliance program with respect to our Code of Ethics and Business Conduct, monitoring of risks associated with workplace discrimination and harassment, and our policies regarding our Company culture. The Corporate Governance and Nominating Committee also oversees the Company's initiatives on sustainability and corporate responsibility matters.

While each committee is responsible for evaluating and overseeing the management of such risks, the Board is regularly informed through committee reports about such risks. In addition, the Board and the committees receive regular reports from the President and Chief Executive Officer, Chief Financial Officer, Chief Administrative Officer, and other Company officers with roles in managing risks.

105. The 2026 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2026 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

106. The 2026 Proxy Statement was also false and misleading because it failed to disclose, *inter alia*, that: (1) the effectiveness of and material benefits resulting from the Company's strategic initiatives were overstated; (2) the Company was unable to efficiently respond to an increasingly aggressive promotional nature of the QSR industry, growing market competition, and shifting values among consumers; and (3) as a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

107. As a result of Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of EY as the Company's independent auditor for Fiscal Year 2026; and (3) approve, on an advisory basis, the compensation of the Company's named executives.

***May 7, 2026 Press Release and Earnings Call***

108. On May 7, 2026, the Company published a press release announcing the Company's financial results for the first quarter of Fiscal Year 2026 ("Q1 2026 Press Release").

109. The Q1 2026 Press Release touted the following developments and Company performance:

***Highlights***

- Global system-wide restaurant sales were $1.20 billion, a 3% decrease compared with the prior year first quarter.
- North America comparable sales decreased 6.4% from a year ago as comparable sales from Domestic Company-owned restaurants were down 5.2% and North America franchised restaurants were down 6.7%; International comparable sales increased 3.6% compared with the prior year first quarter.
- Opened 28 new restaurants system-wide, comprised of 8 restaurant openings in North America and 20 restaurant openings in International markets.
- Net income was $7 million compared with $9 million in the prior year first quarter.
- Adjusted EBITDA was $48 million compared with $50 million in the prior year first quarter.

- Diluted earnings per common share was $0.21 compared with $0.27 in the prior year first quarter; adjusted diluted earnings per common share was $0.32 compared with $0.36 last year.

(Emphasis in original).

110. Defendant Penegor is quoted in the Q1 2026 Press Release as assuring investors that Company is "focused on advancing our transformation strategy, ***including through an expanded range of value options and leaning aggressively into innovation***." Defendant Penegor also added that "[e]xecution in these areas ***will enable us to meet customers where they are and unlock more layers of growth***[,]" and highlighted "[e]xciting strategic partnerships such as our collaboration with Toy Story 5" as "***visible examples of the progress we are making in these areas***."

111. The same day, the Company held the Q1 2026 Earnings Call, during which Defendant Penegor highlighted the Company's strategic transformation, stating, in relevant part:

> ***As anticipated, North America comparable sales ended the first quarter down mid-single digits, primarily driven by declining orders, which were pressured by lower new customer acquisition.*** During the quarter, we continued to see resilience in core pizza and customers ordering multiple pizzas, with flat year-over-year pizza volumes, excluding 2 weeks that were impacted by severe weather and pies per order increasing 5% versus last year. Our loyalty customers continue to be a force for the company, and we added nearly 1 million new loyalty members in Q1. We also saw growth among our frequent and super frequent customers. And combined, these tiers make up approximately 30% of our customer base. Our loyalty customers are our most valuable customers, generating 5% higher ticket per order and ordering twice as often as non-loyalty members. This upside was offset by pizza mix shifting to smaller nonspecialty pizzas, resulting in low single-digit declines in overall pizza sales, excluding severe weather impacts.
>
> Outside of pizza, comparable sales were pressured by declines in size and desserts and lower new customer acquisition compared with last year. ***We are working with urgency to address areas of opportunity and capitalize on areas of strength through our transformation work. Our two largest opportunities to gain share are building on our improved value perception and leveraging our rebuilt innovation pipeline to win new customers, elevate our pizza order mix to more premium pizzas, drive add-ons and expand our total addressable market.***

> ***Starting with our value proposition, we are meeting customers where they are with popular offers***, including Buy One pizza, Get One free, $9.99 3-topping and our Papa Pairings. Leveraging our CRM platform, we meaningfully increased engagement with existing customers, which translated into higher subscriber order frequency in Q1. ***We are also leaning into innovation because newness is critical to winning new customers. We rebuilt our pipeline to deliver more frequent, compelling new product launches.*** And in the first 3 months of 2026 alone, we introduced 2 new menu platforms, Pan Pizza and oven-toasted sandwiches. These launches elevate our pizza mix and expand our total addressable market.
>
> ***
>
> As we discussed on our last earnings call, ***we reinstated advertising co-ops across the U.S. to improve local targeting and relevance***. While still early, 50% of our U.S. restaurant system is now supported by local co-ops across more than 50 markets. With our reestablished co-ops and sharpened value proposition, our local operators are aligning around a unified market strategy, accelerating our ability to win at the local level and driving benefits that will build throughout the year.
>
> ***
>
> In summary, while the consumer environment has impacted the pace of our transformation, we are managing through these short-term headwinds and building for the future. We are confident that we are taking the right actions to transform the business and set Papa John's up for long-term success. We are making progress and are excited about the opportunities ahead.

112. During the Q1 2026 Earnings Call, Defendant Thanawala also emphasized the success and purported benefits of the Company's strategic transformation and further reiterated the financial guidance for 2026, stating in relevant part:

> Now turning to our 2026 outlook. As discussed, ***we are making progress advancing the actions we're taking to transform the business***. We have ***taken steps to accelerate the top line throughout the year through an enhanced value offering, our rebuilt innovation pipeline and improved mix of national and local media through our reestablished local co-ops***. We're also driving efficiencies across our business with our supply chain optimization and cost savings initiatives and evaluating refranchising actions, which are progressing our business towards an asset-light model with higher free cash flow.
>
> With that in mind, ***we are reiterating our 2026 financial and operational metrics***. For 2026, we expect global system-wide sales to range between flat and low single-digit declines. For North America, we still expect comparable sales to be down 2% to 4%. ***Our guidance reflects both the benefit of our innovation pipeline and enhanced marketing strategy and considerations around the current cautious***

> ***consumer environment. April North American comparable sales are trending slightly worse than Q1 on a year-over-year basis, but consistent with Q1 on a 3-year stack.***
>
> ***We expect to build top line momentum in the second half of the year with sequential improvements versus the first half as we benefit from our product innovation, marketing co-op activations and meaningful brand collaborations and strengthened aggregator marketing strategy.*** We expect the North America quarterly comps will be relatively consistent for the remainder of the year on a 3-year stack.
>
> Internationally, we continue to build on our transformation momentum and still expect comparable sales to increase between 2% and 4%. Our outlook reflects current geopolitical and consumer conditions, and we'll continue to monitor developments closely.

113. During the question-and-answer portion of the Q1 2026 Earnings Call, an analyst raised a question regarding de-risking the Company's 2026 financial guidance. In response Defendants Penegor and Thanawala expressed their confidence in the Company's current guidance, as exemplified by the following exchange, in relevant part:

> [Q:] Just a question on the same-store sales guidance. As we look to the rest of the year, your comparisons don't get much easier for the rest of the year until the fourth quarter, but you are baking in a big improvement from the first half of the year. And I'm just curious why maybe not derisk the guidance a bit. I know you have a lot of initiatives to bend the trend in the second half of the year, but why not derisk the guidance a bit? And why, Ravi, should the 3-year trend be the right way for us to model comps as the year unfolds? Just any other color you can provide on 3-year trends being the right metric?
>
> [A: Defendant Penegor] Yes, Brian, I'll start and see if Ravi has anything to add on. If you start to think about where ***our year-over-year comparisons starting to soften and lapping over some of the competitive pressure from a year ago***, the back half, not all the way to the fourth quarter, ***starts to get a little bit easier***. But what we really wanted to look at is how does the business normalize with all the choppiness over the last couple of years. So very clear that our business, our transactions, how we're actually forecasting the outlook, and ***we think we've derisked it*** with really providing guidance that it remains fairly consistent on a stack 3-year basis.
>
> If you think about where we stand with all the second half of the year initiatives, ***we've launched some compelling innovation***. We've got Pan in the world. It's mixing really well with existing consumers. ***The opportunity is to continue to wear it in and recruit new with that great product***. We've got sandwiches in play, again, mixing well with existing consumers, plays to refresh our Papa pairing offering, so

> great value with that in it. And we're really excited about our partnership with Toy Story 5 and driving 8-inch pizzas with some news as we work to compete in the back half of the year.
>
> We'll continue to work to make sure we got our mix well so we compete on third party as the year progresses. ***But we think it's a prudent and realistic outlook for the year with lots of initiatives to support it, and that's considering the competitive and the consumer landscape that we're faced with at the moment.***
>
> Anything else you'd say, Ravi?
>
> [A: Defendant Thanawala] Yes. And Brian, you asked the question of why the 3-year stack. One, like as we looked at month-over-month and where we saw a bit of the trend come through is we saw some consistency there. So one, the underpinning data from Q1 and quarter-to-date Q2 has reflected that. Second is ***middle of 2025, we saw a meaningful step-up in competitive pressure from a promotional standpoint. And if you go back one more year, that was really when we saw the competitive pressure step up from an aggregator standpoint. So we're trying to take into account the competitive landscape, both from what's happening in the respective channels as well as what's been happening from a pricing pressure standpoint.***

114. During the Q1 2026 Earnings Call, Defendants Penegor and Thanawala further elaborated on the Company's performance and highlighted upcoming business and growth prospects, in the following exchange:

> [Q:] First, I was wondering, Ravi, can you decompose the same-store sales between check and traffic? I'm just trying to get a sense of this more competitive approach to value as innovation ramps, kind of what was the drag on check that was part of that down 6.4% North American comp?
>
> [A: Defendant Thanawala] Yes. Check was effectively flat in Q1, and that's been the trend in Q2 quarter-to-date as well. So the check has been there. And as a reminder, there was slight food cost deflation in Q1, some labor productivity and supply chain benefit. So 4-wall margins hung in there fairly well in Q1 because of that. ***But where the sales comp drag has really come has been from a transaction standpoint. If I take -- go one more click down, it was really in small transaction size from a number of pizzas. The transaction loss was in orders that contain only one or no pizzas. We continue to see order growth in multi-pie orders.***
>
> [A: Defendant Penegor] ***That's why we feel confident with the incoming of Toy Story 5 and that partnership that can address that one pie order***. Our challenge really is people are managing their overall check, right? And we're still seeing some of the leakage in size. We've not got cheesy garlic bread as a compelling price point side. We're going to have to continue to make sure sides are relevant. That's the

> opportunity to allow us to drive some check and mix up, but haven't planned for that with the tough consumer environment. So ***our guidance reflects where we stand today.***

***June 30, 2026 Press Release***

115. On June 30, 2026, the Company published a press release announcing that Defendant Thanawala departure from "Papa Johns to assume a chief financial officer position at a another company." Although Defendant Thanawala's departure was effective immediately, he remained "available to Papa Johns in an advisory capacity until July 31, 2026."

116. The statements made in ¶¶ 76-100 and 108-115 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements were false and/or misleading and failed to disclose, *inter alia*, that: (1) the effectiveness of and material benefits resulting from the Company's strategic initiatives were overstated; (2) the Company was unable to efficiently respond to an increasingly aggressive promotional nature of the QSR industry, growing market competition, and shifting values among consumers; and (3) as a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

117. The truth emerged on August 6, 2026, when the Company published the Q2 2026 Press Release, disclosing an ongoing trend of deterioration in the Company's annual performance for the North American region, in pertinent part:

> ***Highlights***
>
> - Global system-wide restaurant sales were $1.20 billion, a 4.8% decrease compared with the prior year second quarter.
> - North America comparable sales decreased 8.3% from a year ago as comparable sales from Domestic Company-owned restaurants were down

8.9% and North America franchised restaurants were down 8.2%; International comparable sales increased 1.5% compared with the prior year second quarter.

- Opened 50 new restaurants system-wide, comprised of 9 restaurant openings in North America and 41 restaurant openings in International markets.
- Net income was $9 million compared with $10 million in the prior year second quarter.
- Adjusted EBITDA was flat year over year at $53 million.
- Diluted earnings per common share was $0.24 compared with $0.28 in the prior year second quarter; adjusted diluted earnings per common share was $0.46 compared with $0.41 last year.

118. Defendant Penegor was also quoted in the Q2 2026 Press Release as acknowledging the decline in the Company's performance, stating in relevant part:

> Second quarter results reflected continued momentum in our International business, where we delivered our seventh consecutive quarter of positive comparable sales, and ongoing headwinds in North America driven by the softer consumer environment, lower order volumes, and a highly promotional QSR marketplace[.]
>
> ***
>
> While ***our transformation is taking longer than anticipated***, we continue to execute our strategy with discipline and focus and are seeing encouraging progress, including a growing and highly engaged Papa Rewards membership, supply chain savings, and AI-driven improvements to the customer ordering experience. By accelerating investments to strengthen our competitive position, improve restaurant economics, and attract new customers, we can build an even stronger foundation to gain market share and drive sustainable long-term growth. Accordingly, ***the Board has decided to suspend the Company's quarterly dividend beginning with the third quarter of 2026 so that we have greater flexibility to make these investments and maintain our strong balance sheet***[.]

119. The Q2 2026 Press Release also revealed the Company was "updating its 2026 annual guidance" detailing the reduction in projections, in the following table:

| Financial Metric | Prior 2026 Outlook | Current 2026 Outlook |
|---|---|---|
| Global system-wide restaurant sales | Flat to Down Low Single-Digits | Down (2)% to (4)% |
| North America comparable sales | Down (2)% to (4)% | Down (6)% to (8)% |
| International comparable sales | Up 2% to 4% | Up 1% to 3% |
| North America gross openings | 40 to 50 | 40 to 50 |
| International gross openings | 180 to 220 | 180 to 220 |
| Adjusted EBITDA (as defined below) | $200 million to $210 million | $180 million to $190 million |
| Adjusted Depreciation and amortization (as defined below) | $70 million to $75 million | $70 million to $75 million |
| Interest expense (net) | $35 million to $40 million | $35 million to $40 million |
| GAAP effective tax rate | 30% to 34% | 30% to 34% |
| Capital expenditures | $70 million to $80 million | $70 million to $80 million |
| Diluted shares outstanding | Approximately 33 million | Approximately 33 million |

120. The same day the Company held the Q2 2026 Earnings Call, during which Defendant Penegor discussed the Company's reduced 2026 financial guidance, stating in relevant part:

> At the same time, we felt the impacts of the softer consumer backdrop and highly promotional QSR environment, which have continued to challenge our financial performance. And while our focus is unrelenting, ***it's clear that our transformation is taking longer than expected.*** We know that ***we must execute better and move faster***.
>
> And as we look ahead, we're making adjustments where needed across our strategic priorities and leadership team to improve results and position Papa John's for 2027 and beyond.

121. Defendant Penegor further continued by stating the following in relevant part:

> Within our core pizza business, orders with multiple pizzas again saw improvement with pies per order up 6%, positively impacting our overall system ticket, which was flat compared with last year. ***This upside was offset by pizza mix shifting to smaller non-specialty pizzas, resulting in mid-single-digit declines in overall pizza sales.***
>
> Outside of pizza, ***comparable sales were pressured by declines in sides and desserts***, while sales of our new sandwiches almost fully offset the removal of Papadias and opened an entirely new food category for us without complicating our make line and operations.
>
> Taking into account our performance and the pressured consumer environment, which we expect to continue throughout the year, ***we have revised our outlook for 2026.*** Chris will provide more detail in his remarks, but at a high level, ***we now expect global system-wide sales to decline between 2% and 4% compared to last***

> ***year and adjusted EBITDA between $180 million to $190 million, which now includes an incremental $18 million of investment to support our franchisees and accelerate our transformation.***
>
> While ***our financial performance isn't where we'd like it to be***, we have a clear understanding of how to improve our results and gain market share. These focus areas work in tandem with our ongoing strategic transformation efforts.
>
> As we have discussed previously, we continue to see 2 clear opportunities to gain share: continuing to strengthen our value perception with more targeted personalized offers, and a consistent, elevated customer experience and attracting new customers through a sharper aggregator strategy, total addressable market expansion, our rebuilt innovation pipeline and a reenergized local presence through reestablished co-ops.

122. Moreover, Defendant Penegor concluded his prepared remarks by reiterating the that the pace of transformation was slower than expected and highlighting new strategies moving forward, in relevant part:

> In summary, we are executing with discipline, investing for the long term and positioning the business for improved comparable sales trends in 2027.
>
> ***
>
> While ***our transformation is taking longer than we anticipated***, we are building the operational and financial foundation to drive sustainable growth. As I've laid out today, ***we'll achieve this by competing on value with more targeted, personalized offers, and consistent elevated customer experience, targeted investments in customer acquisition and brand elevation, and disciplined portfolio optimization and supply chain improvements that strengthen unit economics.***
>
> This strategy is similar to the transformation playbook that has proven successful internationally, and we are confident it will allow us to compete better and win in North America.

123. During the Q2 2026 Earnings Call, the Company's recently appointed CFO, Christopher K. Collins, further detailed the financial elements of the Company's performance in the second quarter of Fiscal Year 2026, stating in relevant part:

> ***Total consolidated revenue for the second quarter was $482 million, down 9% as lower revenue for our domestic company-owned restaurants***, North America

> Commissary, North America Franchising and all other business units was partially offset by higher international revenues.
>
> ***
>
> Revenues in our North America Franchising segment decreased $3 million, primarily due to lower comparable sales at our franchise restaurants. And all other business unit revenues decreased $8 million, driven by lower advertising fund revenue and digital fees as a function of lower system sales. Partially offsetting these declines was a $1 million increase in international revenue.

124. CFO Collins further discussed the Company's reduced financial guidance and noted upcoming shifts in the Company's strategy, stating in relevant part:

> Now turning to our 2026 outlook. As discussed, we are revising our outlook to incorporate year-to-date results in a challenging environment, which we expect to continue for the balance of the year. ***For 2026, we now expect global system-wide sales declines to range between 2% and 4%.***
>
> ***For North America, we expect comparable sales to be down 6% to 8%.*** July North America comparable sales trended in line with Q2 on a year-over-year basis but decelerated on a 3-year stack. We expect sequential improvement in North America comp sales in the second half of the year, supported by our marketing co-op activations, a strengthened aggregator marketing strategy, our new CRM program and prior year comparisons.
>
> Accounting for the impact of geopolitical and consumer conditions, ***we now expect international comparable sales to increase between 1% and 3%.***
>
> ***
>
> ***For 2026, we now expect consolidated adjusted EBITDA to be between $180 million and $190 million. We now plan to invest approximately $35 million in total supplemental marketing and franchisee subsidies***, including the incremental $18 million added for the back half of this year to ***accelerate our transformation***, as Todd described. We expect that elevated investment to continue into 2027.

125. During the question-and-answer portion of the Q2 2026 Earnings Call, Defendant Penegor addressed the challenges the Company's transformation initiatives faced and aspects that should have been executed more effectively, stating in relevant part in the following exchange:

> [Q:] Obviously, a lot going on, a lot of strategies that you're implementing and working through. I guess, if you take a step back in your view, where have broadly the turnaround strategies had the intended impact or had the most impact as you intended?

And, kind of, where are you most lagging versus your expectations in trying to make up ground, understanding, obviously, it's a difficult operating environment.

[A: Defendant Penegor] Yes. Thanks, Andrew, for the question. On the transformation, I think some of the work that we've done over the course of the last couple of years to really rebuild our technology platform create less friction in our ordering through our app, through the website, the work we've done with AI to leverage the data and better connect to the consumer through our CRM program. All of those are strong foundational elements that we've continued to build.

***We rebuilt our innovation pipeline. We brought some news to the table. We're not bringing in as many new consumers with the innovation as we had expected.*** But I do feel good that we've done a nice job on those fronts. And ***we've raised the bar on operational excellence, even though we know we've got some inconsistencies and opportunities to continue to do that.***

I think where we've been probably the ***most challenged is we haven't been able to get the full force of the local co-ops reestablished across the entire system.*** We're making progress on that front, but ***we've now hired out our field marketing team to better support those co-ops*** and make sure we've got a really balanced and thoughtful approach to what national messaging does as well as local messaging to really compete and win and really have a strong barbell at both the national and the local level.

And importantly, ***what we need to really get aligned on is where do we find the right balance between driving transactions and protecting margin. We know we have to meet the consumer where they're at.***

***We can't just live on the quality and the messaging of better ingredients, better pizza.*** We're going to continue to do that with our fan favorites at affordable price points and continue to deliver on the rest of this year. But we know we're going to have to pulse in some appropriate discounting to continue to drive frequency and keep our existing customers engaged. But we try to recruit some new customers through that.

But we're going to be smart about the discounting. We're going to pulse it appropriately, and we're going to leverage the tools at our disposal, especially CRM with some of the optimized AI engine work that we've done to really target those investments.

126. Defendant Penegor also addressed market challenges and shifting consumer values, stating in the following exchange:

[Q:] Okay. Great. And then my follow-up, Todd, is product innovation was a driver that you got -- and actually more of a strategy pivot coming into this year versus

just trying to compete on value. You spoke about -- and which is almost offsetting the lost revenues from Papadias and Papa Bites.

I'm just wondering, given that we're not necessarily seeing it in the same-store sales results, how are the different innovations performing relative to plan? And is this just a tough environment to get a consumer that's so value-focused to want to try something new versus just the tried and true at a lower price point?

[A: Defendant Penegor] Yes, no, I think the consumer is very cautious in making choices with their hard-earned dollars. And in an environment where you want to make sure every one of your dollars works as hard as possible for yourself, you do kind of go back to your tried-and-true favorites that you know can deliver on the experience and not disappoint. And in an environment like that, the role of innovation is a little more challenging to break through.

We think about our pan launch, it mixed really well with our existing consumers, but ***didn't bring in the number of new consumers that we probably would have expected. The same thing with Toy Story, we got a lot of great excitement to keep the brand cool, hip in the discussion, but it mixed well with existing customers but didn't bring as many new in as we would have wanted.***

And I would look at sandwiches as a little more of a long-term opportunity to expand our TAM, as we really think about that as a replacement for Papadias and taking the rhythm-breakers out of the restaurant.

But you are right, innovation in and of itself is a little more challenged to bring in new customers in this environment. ***I think we can do a better job really telling our story on the third-party aggregator channel and what we can bring that's new, unique, and different to provide new access to innovation, and we're adjusting some of our plans moving forward to do that.***

I think that's an opportunity for us. And we're going to continue to really make sure that we find that right balance between innovation, talking about our tried-and-true favorites on the more premium side of the menu at affordable price points and being a little sharper and pulse in a little more value messaging to make sure that we've got a really strong barbell to drive awareness.

But those are good innovations. They're going to play a nice role on our calendar. ***Over time, I do think they will bring in new customers. We're just not seeing that in the environment today***.

127. Furthermore, Defendant Penegor touched on the Company's competition and comparative performance, during the following exchange, in relevant part:

[Q:] This is Mike Tamas on for Brian. Todd, you deployed a lot of new initiatives, and I would have thought that you'd see some improvements in the business by now. So do you think there's a category headwind that you're fighting?

And maybe specifically to the second quarter, what do you believe the category sales trends were in the quarter versus the negative 8% that you guys saw?

[A: Defendant Penegor] Yes, no, it's a great question. I do think all of QSR has had a lot of aggressive discounting. ***Pizza QSR has been even more so aggressive, and we probably didn't meet the consumer as much as we should have in the course of the second quarter as we protected margin a little bit more.***

But I would -- from where we sit, we'd say that the QSR pizza category was down slightly within the quarter. But the pizza category is quite broad. ***There's a lot of other folks now competing in pizza, when you think about convenience stores, gas stations, et cetera.***

So there still is an appetite for broader pizza, and we've got to really consider how we compete, where we show up and how we provide access to the brand. And those are all things that we're addressing in the acceleration of the transformation efforts that we have with the investment that we discussed today.

128. Defendant Penegor further continued in the following exchange, in relevant part:

[Q:] You cited a softer consumer environment as a reason for the U.S. comp weakness, but some other restaurants have reported stronger results this quarter. What do you believe explains that difference?

Is the difference the customer base since Papa John's skews lower income than other QSRs? Is it the competition within the pizza category, including independence on the aggregators or maybe competition from non-pizza competitors, other QSRs, and also convenience stores? And then I have one follow-up after that.

[A: Defendant Penegor] Yes. I think the pizza category has evolved, not just on who competes in the third-party aggregator space. And it's not just competition now against pizza, it's competition against all of QSR, but good quality pizza is showing up everywhere. ***You look at some of the big C-store chains, your local gas stations, they all have pizza.***

So ***we've got to be positioned to compete both on price and quality in a broader environment moving forward***. But if you look at QSR pizza category, as I said earlier, it would be down slightly.

But what has happened in our category has become very competitive on price. We had our 2 largest competitors have deep discounting for the better part of at least half the quarter in one instance and the full quarter in another instance. And ***we didn't answer the bell as strongly as we should have.***

We had deep discounting for 1 week in the quarter. We had Papa Pairings running throughout. We had sharp price points on our everyday favorites on the premium side of the menu. But ***we've got to get that -- the balance of the barbell reworked***

> ***to compete more strongly*** in the competitive and the consumer landscape that we're facing today.

129. On this news, the price of the Company's common stock fell $5.11 or approximately 17.2% per share, from a closing price of $29.75 per share on August 5, 2026, to close at $24.64 per share on August 6, 2026.

## DAMAGES TO PAPA JOHN'S

130. As a direct and proximate result of the Individual Defendants' conduct, Papa John's will lose and expend many millions of dollars.

131. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

132. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

134. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

135. As a direct and proximate result of the Individual Defendants' conduct, Papa John's has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

136. Plaintiff brings this action derivatively and for the benefit of Papa John's to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Papa John's, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act and the aiding and abetting thereof.

137. Papa John's is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138. Plaintiff is, and has been at all relevant times, a shareholder of Papa John's. Plaintiff will adequately and fairly represent the interests of Papa John's in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

139. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

140. A pre-suit demand on the Board of Papa John's is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director Defendants that were on the Board at the time of the filing of this complaint.

141. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

142. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

143. Additional reasons that demand on Defendant Penegor is futile follow. Defendant Penegor has served as the Company's CEO and President and as a Company director since 2024. Defendant Penegor has received and continues to receive compensation for his role as a director and executive officer. Moreover, the Company provides Defendant Penegor with his principal employment. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Penegor also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director

Defendants, including himself, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Furthermore, Defendant Penegor failed to correct and personally made many of the false and misleading statements alleged herein. For these reasons, Defendant Penegor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Coleman is futile follow. Defendant Coleman has served as a Company director since 2012. He also serves as Chair of the Corporate Governance and Nominating Committee. Defendant Coleman has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Coleman also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including himself, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Coleman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Garratt is futile follow. Defendant Garratt has served as a Company director since 2023. He also serves as a Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Garratt has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Garratt also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including himself, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Garratt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Gibbs is futile follow. Defendant Gibbs has served as a Company director since 2023. He also serves as a member of the Audit Committee. Defendant Gibbs has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Gibbs also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including himself, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Gibbs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Koellner is futile follow. Defendant Koellner has served as a Company director since 2014. She also serves as the Chair of the Audit Committee. Defendant Koellner has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty

to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Koellner also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including herself, to the Board thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Koellner breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Mangan is futile follow. Defendant Mangan has served as a Company director since 2019. She also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee. Defendant Mangan has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Mangan also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including herself, to the Board thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Mangan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Medina is futile follow. Defendant Medina has served as a Company director since 2015. She also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee. Defendant

Medina has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Medina also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including herself, to the Board thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Medina breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since 2024. He also serves as a member of the Compensation Committee. Defendant Miller has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Miller also solicited the false and misleading 2026 Proxy Statement which resulted in, *inter alia*, the re-election of the Director Defendants, including himself, to the Board thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on the Board is futile follow.

152. Defendants Koellner, Garratt, and Gibbs served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Koellner, Garratt, and Gibbs failed to adequately review and discuss the Company's public financial statements; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Koellner, Garratt, and Gibbs further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

153. In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

154. Papa John's has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Papa John's any part of the damages Papa John's suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

155. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

156. The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

157. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Papa John's. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Papa John's, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

158. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Papa John's to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

159. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller for Violations of Section 14(a) of the Exchange Act**

160. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

163. Under the direction and watch of Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller, the 2026 Proxy Statement failed to disclose: (1) the Company's ability to attract new customers through the its rebuilt innovation pipeline was overstated; (2) the extent of risk impact related to seasonal fluctuations, increased competition, and changing consumer demographics; and (3) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

164. Moreover, the 2026 Proxy Statement failed to disclose that the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2026 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

165. Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2026 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2026 Proxy Statement, including, but not limited to, the re-election of directors.

166. As a result of Defendants Penegor, Coleman, Garratt, Gibbs, Koellner, Mangan, Medina, and Miller causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Penegor, Coleman, Garratt, Gibbs, Koellner,

Mangan, Medina, and Miller to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

167. The Company was damaged as a result of Defendants Penegor's, Coleman's, Garratt's, Gibbs', Koellner's, Mangan's, Medina's, and Miller's material misrepresentations and omissions in the 2026 Proxy Statement.

168. Plaintiff, on behalf of Papa John's, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

169. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

171. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Papa John's.

173. In breach of their fiduciary duties owed to Papa John's, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the effectiveness of and material benefits resulting from the Company's strategic initiatives were overstated; (2) the Company was unable to efficiently respond to an increasingly aggressive promotional nature of the QSR industry, growing market competition, and shifting values among consumers; and (3) as

a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

174. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

175. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

176. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

177. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Papa John's has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179. Plaintiff, on behalf of Papa John's, has no adequate remedy at law.

**<u>THIRD CLAIM</u>**
**Against Individual Defendants for Unjust Enrichment**

180. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Papa John's.

182. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Papa John's that was tied to the performance or artificially inflated valuation of Papa John's or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

183. Plaintiff, as a shareholder and a representative of Papa John's, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

184. Plaintiff, on behalf of Papa John's, has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants for Abuse of Control**

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Papa John's, for which they are legally responsible.

187. As a direct and proximate result of the Individual Defendants' abuse of control, Papa John's has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188. Plaintiff, on behalf of Papa John's, has no adequate remedy at law.

## FIFTH CLAIM
## Against Individual Defendants for Gross Mismanagement

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Papa John's in a manner consistent with the operations of a publicly held corporation.

191. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Papa John's has sustained and will continue to sustain significant damages.

192. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

193. Plaintiff, on behalf of Papa John's, has no adequate remedy at law.

## SIXTH CLAIM
## Against Individual Defendants for Waste of Corporate Assets

194. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

196. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Papa John's to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

198. Plaintiff, on behalf of Papa John's, has no adequate remedy at law.

## SEVENTH CLAIM
## Against Defendants Penegor and Thanawala for Contribution Under Sections 10(b) and 21D of the Exchange Act

199. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200. Papa John's and Defendants Penegor and Thanawala are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Penegor's and Thanawala's willful and/or reckless violations of their obligations as officers and/or directors of Papa John's.

201. Defendants Penegor and Thanawala, because of their positions of control and authority as officers and/or directors of Papa John's, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Papa John's, including the wrongful acts complained of herein and in the Securities Class Action.

202. Accordingly, Defendants Penegor and Thanawala are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

203. As such, Papa John's is entitled to receive all appropriate contribution or indemnification from Defendants Penegor and Thanawala.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Papa John's, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Papa John's;

(c) Determining and awarding to Papa John's the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Papa John's and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect Papa John's and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Papa John's to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Papa John's restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 26, 2026

Respectfully Submitted,

**THOMAS R. KERR, ATTORNEY AT LAW**

Thomas R. Kerr
732 Scott Street
Covington, KY 41011
Telephone: (859) 512-4321
Facsimile: (859) 431-3463
Email: tom@thomaskerr.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Randall Jordan, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of October 2026.

DocuSigned by:
Randall Jordan
208C8FF6E43A446...
Randall Jordan